Julius HOBSON, et al., Plaintiffs,

v.

Jerry V. WILSON, et al., Defendants.

Civ. A. No. 76–1326.

United States District Court,
District of Columbia.

June 1, 1982.

---

J.E. McNeil and Daniel Schember, Washington, D.C., Anne Pilsbury, Norway, Me., Burton D. Weschsler, Urban Law Institute for Antioch School of Law, Herbert Semmel, Antioch School of Law, Washington, D.C., for plaintiffs.

David H. White, Dept. of Justice, Laura W. Bonn and George Barclay, Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs brought this action for damages and injunctive relief against the District of Columbia and a number of active and retired members of the Metropolitan Police Department ("MPD") and the Federal Bureau of Investigation ("FBI").[1] The amended complaint filed October 28, 1977, alleged that defendants had systematically violated plaintiffs' constitutional rights, individually and through conspiracies, while plaintiffs engaged in lawful protest against government policy in the late 1960's and in the 1970's in the Washington area. Trial of the damages claim began on November 23, 1981, and continued for seventeen days.[2] A

---

1. Numerous defendants named in the amended complaint obtained voluntary dismissal of claims against them prior to submission of the issues to the jury. Defendants remaining in the litigation when the case was submitted to the jury are identified *infra* at 1164–1165.

2. The parties had pursued discovery for several years, during which time the case was assigned

jury of six returned verdicts, after nearly five days of deliberation, on December 23, 1981.[3] Now before the Court are motions pursuant to Fed.R.Civ.P. 50(b), 59(a) for judgment notwithstanding the verdicts or, in the alternative, for a new trial.[4]

## I. Introduction

The verdicts the jury returned found most of the defendants liable to plaintiffs and awarded most of the plaintiffs substantial sums in compensatory and punitive damages. The total amount of all awards to the eight prevailing plaintiffs against the 13 defendants found liable to them was $711,937.50. Three plaintiffs recovered $81,062.50 each and five recovered $93,750 each.[5] One plaintiff, the Washington Area Women Strike for Peace ("WAWSP"), was found not to have been injured by any defendant, and consequently had no recovery.

The individual defendants found by the jury to be liable to one or more plaintiffs included five persons employed at FBI headquarters or the FBI Washington Field Office ("WFO"). Defendant Brennan was a section chief, and later assistant director, of the FBI's Domestic Intelligence Division from 1966 to 1971. Defendant Moore served from 1967 to 1974 as a section chief in the same division as Brennan. Defendant Jones held the post of Security Coordinating Supervisor at WFO from 1964 to 1974. Defendant Grimaldi worked as a special agent at WFO from 1968 to 1970 and defendant Pangburn held a similar position from 1968 to 1972.

The defendants employed by the District of Columbia included former MPD Chief Wilson, former Intelligence Division Inspector Herlihy, and four officers assigned to the Intelligence Division during some of the years when plaintiffs claimed to have been injured. Those officers were defendant Acree, a sergeant at the relevant time; defendant Scrapper, also a sergeant; defendant Suter, then a lieutenant; and defendant Mahaney, then a line officer. The other individual MPD defendants were three undercover officers assigned to the Intelligence Division during the relevant period: defendants Bynum, Jagen, and Markovich.

According to plaintiffs, the FBI defendants collaborated with each other, with other FBI agents, and with the MPD defendants in a variety of efforts to impede plaintiffs' association with others for the purpose of publicly expressing opposition to government policies, chiefly opposition to the Viet Nam War and to policies espoused by national and local officials on race relations. Many of defendants' activities alleged to have injured plaintiffs were related to COINTELPRO, a then-secret FBI ac-

---

to several judges of this Court. The final trial date had been established in the Pretrial Order filed August 14, 1981.

**3.** A blank copy of the special verdict form is attached as Appendix I.

**4.** Consideration of the prayer for equitable relief has awaited disposition of the damages claim in the district court.

**5.** The three plaintiffs recovering the lesser sum were Tina Hobson, an activist in the anti-war and civil-rights movement in Washington since 1964; David Eaton, a member of the Black United Front who protested against American involvement in the Indochina war; and Reginald Booker, a civil-rights activist who served on the Emergency Committee on the Transportation Crisis ("ECTC"), a local *ad hoc* citizens' group that *inter alia* opposed destruction of dwellings in older Washington neighborhoods to make way for new highways. The five plaintiffs recovering the greater sum were

Abraham Bloom, an organizer of the Washington Area Peace Action Coalition ("WAPAC"); Arthur Waskow, a fellow of the Institute for Policy Studies ("IPS"), a Washington organization for the study of public policy; Sammie A. Abbott, an anti-war activist and ECTC organizer; Richard Pollock, a former college journalist active in anti-war organizations based in Washington, and for a time an office worker for the People's Coalition for Peace and Justice; and the Washington Peace Center ("WPC"), a permanent organization that seeks to redirect military spending to other uses and that participated through its membership in protests in Washington against the Viet Nam War.

Plaintiff Julius Hobson died prior to trial of the damages claim and his claims were not pursued. Plaintiff ECTC apparently discontinued prosecution of its claims prior to assignment of this case to the trial judge.

tivity begun in 1967 and discontinued in the early 1970's. COINTELPRO had two components: COINTELPRO—New Left, which concerned activities of persons opposed to American involvement in the Viet Nam War and other related policies of the national government, and COINTELPRO—Black Nationalist, which concerned activities of persons seeking enhancement of civil rights for black persons. According to a memorandum prepared by defendant Brennan and circulated to the other FBI defendants and to agents across the country, COINTELPRO, in its "New Left" dimension, had the following objective:

> The purpose of this program is to expose, disrupt, and otherwise neutralize the activities of this group and persons connected with it. It is hoped that with this new program their violent and illegal activities may be reduced if not curtailed.

Plaintiffs' Exhibit 3. The purpose of COINTELPRO—Black Nationalist, according to an earlier memorandum, was *inter alia* to "[p]revent the coalition of militant black nationalist groups;" the Southern Christian Leadership Conference, then headed by the Rev. Dr. Martin Luther King, Jr., was one of four "primary targets" listed in the same memorandum.[6] The memorandum that had initiated COINTELPRO-Black Nationalist advised the agents to whom it was addressed, "You are urged to take an enthusiastic and imaginative approach to this new counterintelligence en-

deavor and the Bureau will be pleased to entertain any suggestions or techniques you may recommend." *See* Plaintiff's Exhibit 1. In addition to testimony there were in evidence some FBI documents indicating that COINTELPRO interfered tangibly with the protest activities of the kind carried on by plaintiffs. *See, e.g.;* Plaintiffs' Exhibit 13 (WFO reporting that FBI distribution of fictitious addresses for housing of demonstrators at 1968 Chicago demonstrations caused "numerous demonstrators" to make "useless trips to locate nonexistent addresses."); Plaintiffs' Exhibit 69 ("security squad Buagents" supervised by defendant Jones instituted "an intensive interview program in the New Left community ..." which "produced tangible results in the disruption of the day to day activities in the New Left communes....."). At trial, plaintiffs asserted, and the jury evidently was persuaded, that plaintiffs were victims of three conspiracies, actionable under 42 U.S.C. § 1985(3), to violate their civil rights. One such conspiracy, the jury found, included the five FBI defendants; another encompassed certain of the MPD defendants; and a third involved both FBI and MPD defendants. The jury also found that many of the defendants, acting outside the scope of any conspiracy, injured various plaintiffs in the exercise of their First-Amendment rights. The First-Amendment rights plaintiffs alleged had been violated included the opportunity to assemble for

---

**6.** The memorandum to the field offices announced five goals for the "Black Nationalist" COINTELPRO undertaking:

> 1. Prevent the *coalition* of militant black nationalist groups...
> 2. Prevent the *rise of a "messiah"* who could unify, and electrify, the militant black nationalist movement...
> 3. Prevent *violence* on the part of black nationalist groups...
> 4. Prevent militant black nationalist groups and leaders from gaining *respectability,* by discrediting them...
> 5. ... [P]revent the long-range *growth* of military black nationalist organizations, especially among youth.

Plaintiffs' Exhibit 2 (emphasis in original).

The memorandum went on to instruct the field offices to develop plans for "counterintelligence action" and to submit them for approval and "field-wide" coordination. *See* Plain-

tiffs' Exhibit 2. As part of the program, field offices were to report, every 90 days, on "[a]ny changes in the overall black nationalist movement [including] new organizations, new leaders, and any changes in data" previously obtained by the FBI. *Id.* An earlier memorandum had similarly informed the field offices that "Black Nationalist" groups had to be watched, and that "[t]he activities of all such groups of intelligence interest to this Bureau must be followed on a continuous basis so we will be in a position to promptly take advantage of all opportunities for counterintelligence and to inspire action in instances where circumstances warrant." Plaintiffs' Exhibit 1.

*See generally* S.Rep. No. 94–755, Supp.Vol. 3 (Staff Report of Select Committee to Study Governmental Operations with respect to Intelligence Activities). *See also* note 12 *infra* (discussing memorandum establishing COINTELPRO–New Left).

political protest, to associate with others in order to engage in political expression, and to speak on public issues, free of unreasonable government interference. Plaintiffs offered evidence of broad undertakings by defendants to disrupt their activities and of specific instances in which FBI and MPD action allegedly impeded those activities.

Only two defendants, Bynum and Markovich, were found to be not liable to any plaintiff. Having determined that the other defendants were liable on various claims, the jury awarded varying sums to the prevailing plaintiffs against those defendants. The jury found all defendants other than Markovich and Bynum liable to plaintiffs Bloom, Abbott, Pollock, Waskow, and WPC. The jury also returned verdicts for plaintiffs Hobson, Eaton, and Booker against the five FBI defendants but, among the MPD defendants, only against former Chief Wilson and former Inspector Herlihy. All defendants except the District of Columbia and MPD officer Mahaney were found to be liable for both compensatory and punitive damages.[7] The largest judgment against any individual defendant was that awarded against defendant Brennan, whom the jury found personally liable for $9,375 to each of the eight prevailing plaintiffs, for a total of $75,000 of which $50,000 was compensatory, and $25,000 punitive, damages. The jury returned the smallest award against defendant Mahaney, who was found liable to five plaintiffs for $1,875 each, for a total of $9,375, all compensatory. Every prevailing plaintiff recovered $37,937.50, all compensatory, from the District of Columbia.[8]

In their present motions for relief from the verdicts, the defendants found liable to various plaintiffs state numerous grounds for judgment notwithstanding the verdict ("judgment n.o.v.") and for a new trial. Defendants assert that the instructions on conspiracy and on the defense afforded by the statute of limitations were erroneous, and that even if the instructions were correct, the jury improperly found conspiratorial liability and improperly denied them relief from plaintiffs' claims under the statute of limitations. Defendants also assert that the damages awarded were excessive, and that the Court erred in not instructing the jury that the United States would not pay an award against the FBI defendants. The District of Columbia objects to the instructions on municipal liability, and, assuming *arguendo* the instructions were not erroneous, to the verdicts the jury returned against it. And all defendants also claim that the verdicts against them for conduct allegedly performed outside the scope of the alleged conspiracies similarly were not supported by the evidence. There are numerous other objections in defendants' motions.[9] Each plaintiff also has sought judgment n.o.v. against defendants Bynum and Markovich, and plaintiff WAWSP seeks judgment against all the other defendants as well as Bynum and Markovich.[10] For the reasons stated below, the Court will deny all motions, except the motion of defendants Wilson and Herlihy for relief from the jury's award of punitive damages.

## II. The Instructions and Proof of Liability

### A. *Liability under 42 U.S.C. § 1985(3)*

#### 1. *The Conspiracy Instructions*

In their motion for a new trial the District of Columbia defendants renew

---

**7.** In each instance in which the jury awarded punitive damages against a defendant to a particular plaintiff, the punitive award was one-half the amount of compensatory damages.

**8.** *See* chart on p. 1188 *infra.*

**9.** Defendants also assert that the Court's special verdict form was prejudicial or confusing; that the Court's rulings on admissibility of certain FBI records and documents were prejudicially erroneous; that the evidence, even if it required an instruction on punitive damages, did not support the jury's determination that they should be awarded; and that a new trial is

required because the Court denied a motion for mistrial based upon defendants' discovery of an allegedly improper contact between one of plaintiffs' counsel and members of the jury. Defendant Jones argues that he is entitled to relief because the Court denied various motions that would have dismissed claims against him or granted him a separate trial at a later date.

**10.** There also remains a motion for sanctions against defendant Markovich for an alleged violation of the discovery obligations imposed by Fed.R.Civ.P. 37(d).

their argument, first advanced at a pretrial conference and in their pretrial brief, that employees of the District cannot be liable as "persons within any State or Territory" under the terms of 42 U.S.C. § 1985(3). Defendants rest their argument on the interpretation of 42 U.S.C. § 1983 in *District of Columbia v. Carter,* 409 U.S. 418, 420–24, 93 S.Ct. 602, 604–06, 34 L.Ed.2d 613 (1973), in which the Supreme Court held that District employees did not in the course of their official duties act—for purposes of 42 U.S.C. § 1983—under color of law of "any State or territory" so as to make their conduct actionable under section 1983.[11] This action is based, however, on section 1985(3). The conspiracies that are actionable under 42 U.S.C. § 1985(3) exist whether or not the participants act under color of any official authority. The *Carter* decision, which did not require construction of the geographical terms of section 1985(3) that are at issue here, is wholly immaterial to this case. *See District of Columbia v. Carter, supra,* 409 U.S. at 421–424, 93 S.Ct. at 604–06; *cf. Hurd v. Hodge,* 334 U.S. 24, 31, 68 S.Ct. 847, 851, 92 L.Ed. 1187 (1948) (construing language identical to section 1985(3) in 42 U.S.C. § 1982). *Hurd v. Hodge* controls the question here. It would indeed be anomalous if private discriminatory conduct enjoyed a geographical immunity simply because it occurred in the nation's capital. *Cf. Hurd v. Hodge, supra,* 334 U.S. at 31, 68 S.Ct. at 851. Accordingly, defendants' motion on this issue cannot be granted.

▪ Defendants also assert now, as they did at trial, that there was no evidence of "class-based discriminatory animus" to justify an instruction on liability under 42 U.S.C. § 1985(3). *Griffin v. Breckenridge,* 403 U.S. 88, 96–104, 91 S.Ct. 1790, 1795–99, 29 L.Ed.2d 338 (1971), established the basic elements of conspiracies actionable under section 1985(3). The proof of a conspiracy to violate civil rights is often circumstantial, and determination of the ultimate fac-

tual questions of intent is peculiarly within the province of the jury. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 175–88, 90 S.Ct. 1598, 1617–19, 26 L.Ed.2d 142 (1970) (Black, J., concurring in the judgment). The District of Columbia defendants appear, however, to argue that it was·error to instruct the jury on section 1985(3) because the alleged conspiracy was not based on racial animus. *See generally Griffin v. Breckenridge, supra,* 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. Passing for the moment the question whether there was sufficient evidence for the verdicts that the jury returned, it is long past·dispute that section 1985(3) does not require that the targets of the conspiracy be members of a particular racial group. That principle has been clear at least since *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975). The cases now make it plain that it is the agreement *vel non* among the alleged conspirators to single a particular group or class for discriminatory interference with constitutional rights that should itself define the class for purposes of section 1985(3). If a conspiracy actionable under section 1985(3) does exist, it will have defined for itself the group or class of persons it intends to victimize. *See Scott v. Moore,* 640 F.2d 708, 718–19 (5th Cir.1981); *cf. Kimble v. McDuffy,* 648 F.2d 340, 346–47 (5th Cir.1981) (en banc); *see also Canlis v. San Joaquin Sheriff's Posse Comitatus,* 641 F.2d 711, 719 n. 15 (9th Cir.1981) (collecting cases). *See generally Hampton v. Hanrahan,* 600 F.2d 600, 624 (7th Cir.1979), *cert. denied on these grounds, rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). In this case plaintiffs offered, as proof of conspiratorial consensus defining the target classes, FBI memoranda launching COINTELPRO and directing agents' attention to "New Left" and "Black Nationalist" political associations, as well as testimony of participants in the FBI program.[12] Plaintiffs also exam-

---

11. Congress, in Pub.L. No. 96–170, amended section 1983 in 1979 to limit the *Carter* decision. *See* 93 Stat. 1284; [1979] U.S.Code Cong. & Admin.News 2609.

12. An FBI memorandum written by defendant Brennan on May 9, 1968, proposing that the Bureau establish what became COINTELPRO–

ined the MPD defendants on the criteria explicitly used by the Intelligence Division to identify targets for the Division's activities, and they closely questioned the MPD defendants on the implications of those criteria. There was substantial evidence from which the jury could have found that the alleged conspiracies targeted plaintiffs as opponents of the Viet Nam War or proponents of racial justice. Accordingly, the Court could not have kept plaintiffs' claims of conspiracy from the jury. *See Adickes v. S.H. Kress, supra; Hampton v. Hanrahan, supra.*

■ Conceding *arguendo* that the conspiracy issues had to be put to the jury, the FBI defendants raise specific objections to the content of some of the conspiracy instructions. One of their objections is that the Court incorrectly defined "overt act." The Court defined "overt act" using the familiar standard instruction in the District of Columbia "Red Book."[13] As the FBI defendants correctly observe, a recovery under section 1985(3) may be had only if a plaintiff suffered an injury as a result of an act taken in furtherance of the conspiracy. *See* 42 U.S.C. § 1985(3) ("... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury"); *cf. Edwards v. James Stewart &*

Co., 82 U.S.App.D.C. 123, 125, 160 F.2d 935, 937 (1947); *Fitzgerald v. Seamans,* 384 F.Supp. 688, 693 (D.D.C.1974), *rev'd on other grounds,* 180 U.S.App.D.C. 75, 553 F.2d 220 (1977). Nevertheless, proof of the agreement itself, as distinct from compensable injury, may derive from evidence of acts done by conspirators, whether or not the act caused an injury that would be actionable under section 1985(3). *See, e.g., Hampton v. Hanrahan, supra,* 600 F.2d at 624.[14] Thus when the FBI defendants contend that the Court erred in failing to instruct that "the overt act which makes the conspiracy actionable must have caused actual injury to the person, property or rights of the plaintiff," they presumably mean to assert that the Court failed to instruct the jury that an overt act in furtherance of the conspiracy must have injured the plaintiff, if that plaintiff is to have a recovery for that injury under section 1985(3).

■ The FBI defendants have not fairly read the Court's instructions. The Court instructed the jury that "the defendant must ... have been proved by a preponderance of the evidence to have been a member of the conspiracy at the time the co-conspirator acted to injure the plaintiff in furtherance of his or her conspiratorial agreement."[15] Any question in the jury's mind

New Left, described the objectives of the program in this way:

"Our Nation is undergoing an era of disruption and violence caused to a large extent by various individuals generally connected with the New Left. Some of these activists urge revolution in America and call for the defeat of the United States in Vietnam. They continually and falsely allege police brutality and do not hesitate to utilize unlawful acts to further their so-called causes. The New Left has on many occasions viciously and scurrilously attacked the Director and the Bureau in an attempt to hamper our investigation of it and to drive us off the college campuses. With this in mind, it is our recommendation that a new Counterintelligence Program be designed to neutralize the New Left and the Key Activists. The Key Activists are those individuals who are the moving forces behind the New Left and on whom we have intensified our investigations.

Plaintiffs' Exhibit 3. *See also* Plaintiffs' Exhibits 1, 2 (COINTELPRO–Black Nationalist). The significance of the COINTELPRO directives

and definitions for defendants' motion for judgment notwithstanding the verdicts on the conspiracy claims is considered at pp. 1169–1170, *infra.*

**13.** The Court thus advised the jury, "An 'overt act' is simply any act knowingly committed by one of the conspirators, in an effort to effect or accomplish some object or purpose of the conspiracy."

**14.** In this case, for example, plaintiffs offered extensive evidence of defendants' efforts to maintain secrecy regarding various FBI and MPD operations. While that conduct would not be actionable under section 1985(3), proof of it could have assisted the jury in assessing the character of the alleged conspiracies. *See Hampton v. Hanrahan, supra,* 600 F.2d at 622.

**15.** The verbatim transcript of most of the proceedings in this case, including instruction of the jury, has not now been filed in the record. Quotations from the instructions in this Memorandum are drawn from the Court's notes, and

that only acts in furtherance of the conspiracy causing injury were compensable must have been put to rest by the Court's subsequent instruction that liability would depend upon proof that "the act causing injury was committed by some one or more of [the] defendant's co-conspirators," if it had not been committed by the defendant himself. The separation of the basic definitions of the civil conspiracy from the elements of proof of liability in the instructions was merely a function of the fact that a Court's instructions, like any other exposition, can only address one point at a time. "The impact of a jury instruction 'is not to be ascertained by merely considering isolated statements, but by taking into view all the instructions given.'" *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 156–57, 87 S.Ct. 1975, 1992, 18 L.Ed.2d 1094 (1967) (*quoting Seaboard Air Line Ry. v. Padgett*, 236 U.S. 668, 672, 35 S.Ct. 481, 482, 59 L.Ed. 777 (1915)). The instructions here introduced all the major terms the jury needed to apply, including "overt act," and then led the jury through the order of proof of the various claims and defenses. No juror who followed the Court's instructions could have conscientiously returned a verdict on the conspiracy theory for a plaintiff unless the juror believed that the plaintiff had proved that he or she had been injured by an act taken by a defendant or some other co-conspirator in furtherance of the conspiracy.

■ Defendants' second objection to the conspiracy instructions is that the instructions permitted the jury to find a defendant liable under section 1985(3) without having found him to possess the *Breckenridge* "discriminatory animus." That objection, too, involves an implausible reading of the instructions. The instructions, incorporating the familiar principles of general civil-conspiracy doctrine,[16] explained to the jury that "the participants in a conspiracy share the same general conspiratorial objective:

there exists a meeting of the minds which creates an understanding to achieve the conspiracy's objectives. Thus all participants know the common plan; each knows the conspiracy's essential nature and general scope." The instructions then defined a conspiracy actionable under section 1985(3) as one in which "the conspiracy discriminated with hostile intent against a group or class to which plaintiff belonged, with a view to singling out that group or class" for interference with its members' rights under the Constitution.[17] Under those instructions, the *raison d'etre* for the conspiracy was discrimination "with hostile intent against a group or class to which plaintiff belonged," and to find a defendant liable for the conspiracy, the jury had to find that that defendant knew and agreed to the "general conspiratorial objectives." While the instructions did state that a plaintiff must prove that "*the conspiracy* discriminated with hostile intent," a person could not have been in the conspiracy, according to the instructions, unless he agreed to the "general conspiratorial objectives." The jury could not, under these instructions, have thought "the conspiracy" to be capable of some distinct "hostile intent" not shared by those who had formed the conspiracy and defined its objectives, inasmuch as a conspiracy is simply an agreement among individuals to act together in particular ways. Thus defendants' second attack on the conspiracy instructions, like the first, has no basis in a reasonable reading of the instructions.

### 2. The Conspiracy Proof

[9] Defendants argue that they are entitled to judgment n.o.v. on the conspiracy issues. The evidentiary criteria for grant of judgment n.o.v. match those for grant of a directed verdict. *Murphy v. United States*, 653 F.2d 637, 640 (D.C.Cir.1981). Neither form of relief from a determination

---

are believed to match the instructions given the jury.

16. *See Hampton v. Hanrahan, supra*, 600 F.2d at 620–23.

17. The relevant concept of discrimination itself was explained to the jury as an objective, on the part of the conspiracy, to single out the class or group "for interference with its rights, equal to that of the general public, to assemble or associate for political purposes."

of the facts by a jury is appropriate unless "the evidence, together with all reasonable inferences that can reasonably be drawn therefrom, is so one-sided that reasonable men could not disagree on the verdict." *Vander Zee v. Karabatsos,* 191 U.S.App. D.C. 200, 203, 589 F.2d 723, 726 (1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). In this case, defendants' view of the jury's verdicts, and the evidence upon which the verdicts were based, is not persuasive.

▪ Defendants' principal argument for judgment n.o.v. is that the evidence demonstrated that they were simply law-enforcement officers performing their duties within relatively small, closely-knit organizations: the MPD Intelligence Division, the WFO, and the FBI headquarters unit. Undoubtedly the fact that defendants were co-workers within various police and intelligence organizations would not alone establish the conspiratorial liability the jury found. *Cf. Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66, 70–72 (2d Cir. 1976); *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 1005 (E.D.Pa.1974). Yet is it also possible for officers belonging to the same law-enforcement unit to conspire among themselves to engage in conduct denounced by the Civil Rights Act and actionable under section 1985(3). *See Hampton v. Hanrahan, supra,* 600 F.2d at 621, 623–24; *cf. Rackin v. University of Pennsylvania, supra.*

In the present case, plaintiffs introduced substantial documentary evidence of close coordination within WFO, and between WFO and other FBI units, including headquarters, to disrupt and discredit individual and group protest activities the agents believed to be part of the "New Left" or "Black Nationalism." The evidence of that concerted activity indicated that, consistent with FBI practice, individual agents exercised considerable discretion and initiative, subject to higher authorities' approval, in

planning and working together to disrupt protest activities in which plaintiffs were involved. There was also evidence of a similar pattern of activity among the MPD defendants, though the evidence concerning MPD activity was less extensive than that regarding the FBI.[18] Moreover, plaintiffs introduced evidence of regular contacts between supervisory personnel of the Intelligence Division, including some defendants, and WFO agents engaged in COINTELPRO activities. On the other hand, MPD defendants denied at trial any recollection of participation by them in any concerted illegal activities with the FBI, and all the defendants indicated that whatever they did to obstruct plaintiffs' activities was assumed by them to be specifically required by their orders from higher officials.

▪ Passing for the moment the question whether defendants were entitled to official immunity,[19] and addressing only the character of their action as conspiracy *vel non,* the motions for judgment n.o.v. are not well-taken. The Court instructed the jury that "the fact that the individual defendants were engaged in law enforcement work in particular agencies of the F.B.I. and the police department is not, standing alone, proof of a conspiracy, nor does that fact preclude the existence of a conspiracy between some or all of them." That instruction was delivered at defendants' request. Only by impermissibly weighing the evidence could the Court now overturn the verdicts that built upon that instruction. Plaintiffs adduced documentary evidence and live testimony of wide-ranging long-term efforts by all the defendants to disrupt plaintiffs' political activities. Evidence of express agreements to violate plaintiff's constitutional rights was, predictably, absent from plaintiffs' case, for the most part. But direct evidence of an agreement to achieve a particular purpose need not be present. *Cf. Vander Zee v. Karabatsos, supra,* 191 U.S.App.D.C. at 150, 589

---

**18.** According to testimony of some witnesses, the Intelligence Division operated without extensive written guidelines and without recording all its activities in written reports, and many records that did exist were destroyed in the 1970's.

**19.** *See* pp. 1178–1181 *infra.*

F.2d at 727 (contract formation); *see also Adickes v. S.H. Kress & Co., supra* (civil conspiracy).

How much a particular defendant may have known of the overall design to violate First-Amendment rights was critical to plaintiffs' case. Defendants denied knowledge of any conspiracy or scheme to disrupt lawful protests. There was evidence, including key documentary evidence, to the contrary. The scope of a defendant's knowledge of arrangements existing between other persons must often be deduced from circumstantial evidence. If the inferences the jury has drawn from that evidence are reasonable, then the verdict must stand. *Cf. Boutros v. Riggs Nat'l Bank,* 655 F.2d 1257, 1259–60 (D.C.Cir.1981). Particularly is this so when the evidence did show without contradiction that defendants were positioned in organizations where oral and written information was required to move up and down and to and from them in a chain of command, as a matter of course. *Cf. Hampton v. Hanrahan, supra.* In light of this and similar evidence the Court cannot disturb the jury's judgment on the issue of conspiratorial liability.

B. *Liability based upon non-conspiratorial conduct*

Plaintiffs also alleged that individual defendants engaged in conduct proximately injuring plaintiffs that was not part of a conspiratorial design. The jury returned verdicts for most of the plaintiffs upon that theory of non-conspiratorial liability, and defendants found liable on that theory now seek judgment n.o.v.

■ Many of the defendants held supervisory positions within the MPD or the FBI. As supervisors they had authority to direct the conduct of other agents and line officers, informants, and so-called *agents provocateurs.* In order to be held accountable in damages for the action of a subordinate, however, the supervising officer must have so exercised his authority as to have made his own conduct a proximate cause of the injury suffered by the victim. *See Owens v. Haas,* 601 F.2d 1242, 1245–47 (2d Cir.

1979), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1980); *cf. Monell v. Department of Social Services,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1978); *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978); *Carter v. Carlson,* 144 U.S.App.D.C. 388, 393–95, 447 F.2d 358, 363–65 (1971) *rev'd on other grounds,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *Tate v. District of Columbia,* Civil Action No. 81–846 (D.D.C., Oct. 26, 1981) (Greene, J.). The instructions so stated.

■ When the defendants moved for a directed verdict at the close of plaintiffs' evidence, the Court, without objection from plaintiffs, granted the motions of ten of them, most of whom were present or former MPD officers. There was evidence, however, that all of the other defendants played a role in the program of harassment and disruption outlined by plaintiffs' evidence, and the evidence of their personal involvement, beyond the scope of what could properly be considered a conspiratorial plan or agreement, was not so insubstantial that it could be taken from the jury. The evidence against the defendants left in the action after the motion for a directed verdict was in some instances largely circumstantial. Defendant Mahaney, for example, an MPD officer who coordinated activities of the undercover agents Bynum and Markovich, was found liable to some plaintiffs even though Bynum and Markovich were found not liable to the same plaintiffs. There was evidence, however, that other MPD undercover activity injured plaintiffs, and the jury could have inferred that Mahaney had a supervisory role in that other injurious activity. Plaintiffs' case against FBI defendant Pangburn also was to a large degree circumstantial. Pangburn was found liable to all the prevailing plaintiffs, even though he appears to have worked principally in the so-called "Racial Matters" dimension of COINTELPRO. The jury nonetheless returned verdicts against him in favor of plaintiffs with no direct involvement in Pangburn's own civil-rights target groups. But those verdicts were supported by evidence that the disrup-

**1172**

tion of the civil-rights movement, and the somewhat successful effort to discourage civil-rights activists from participation in anti-war protests, impeded plaintiffs engaged in either activity from free exercise of their First-Amendment rights. The Court's task is at an end if it can discern any permissible theory of liability upon which the jury may have relied; the evidence upon which that theory may have been based need not be "strong." *Murphy v. United States, supra,* 653 F.2d at 646. The plausibility of plaintiffs' theories of liability and the credibility of the evidence for and against those theories are ultimately the business of the trier of fact.[20] The motions for judgment n.o.v. on the jury's findings of non-conspiratorial liability cannot be granted.

## C. *Municipal liability*

[14] The District of Columbia, arguing that it could not have been liable on any theory to the plaintiffs, challenges the verdicts that the jury returned against it. According to defendant, the District of Columbia government "cannot be held liable under the theory of *respondeat superior.*" Defendant's statement is undoubtedly correct. *See Monell v. Department of Social Services, supra,* 436 U.S. at 691, 98 S.Ct. at 2036.

---

**20.** Defendants appear not to argue that the jury failed to distinguish between conspiratorial and non-conspiratorial liability in making its findings; defendants do, however, argue that plaintiffs recovered more than once for the same injuries and that the damages therefore are excessive. The latter problem is discussed *infra* at pp. 1188–1189. Even if defendants did argue that the jury found the same acts to be chargeable under both the conspiratorial and non-conspiratorial theories of liability, their attack would fail. There is no reason to doubt that, in finding liability on both types of theory, the jury first determined the scope of the conspiracy, and then determined whether there were any injuries caused by a defendant's conduct that was unconnected to participation in the conspiracy.

**21.** *Monell v. Department of Social Services, supra,* overruled *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), insofar as *Monroe* had held that local governments were not among the "persons" whom 42 U.S.C. § 1983 subjects to civil liability. In *Monell* the Court established that. "a local government may not be sued under § 1983 for an injury

But the Court did not instruct the jury in a manner permitting recovery under *respondeat superior.* The instructions informed the jury that plaintiffs could recover damages from the District government only if an employee causing injury acted "in execution of the District's laws, policies, or customs;" those "policies or customs," as the Court explained, had to be "policies or customs that are made by its law-makers," or "policies that are generally enforced by District employees in the community with the implicit approval of the District government." Since the decisions in *Monell v. Department of Social Services, supra,* and *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the principle of municipal liability for constitutional torts has had a firm basis.[21] There is no basis in this case for distinguishing the rules established in *Monell* and *Owen* for section 1983 municipal liability from those governing the liability of the District of Columbia in non-statutory constitutional litigation. The District's employees may be liable under a *Bivens* theory, and the rules governing their liability are generally to follow those existing under the statutory remedy. *Cf. Dellums v. Powell,* 184 U.S. App.D.C. 324, 333, 566 F.2d 216, 225 (1977),

inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2037. In *Owen v. City of Independence, supra,* the Supreme Court rejected a construction of section 1983 that would have allowed municipalities a qualified "good faith" immunity from liability for constitutional violations. Noting that section 1983 "was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations," the Supreme Court concluded that its rule also "harmonizes well with developments in the common law," and suggested that municipal liability without "good-faith" immunity was essential to assure the "innocent individual who is harmed by an abuse of governmental authority ... that he will be compensated for his injury." 100 S.Ct. at 1416, 1418–19.

*cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). The District should be exposed to the same municipal liability, and have the benefit of the same limitations on that liability, as that attaching to other city governments.[22]

 Defendant does not even appear in its motion for relief from the verdicts to press the argument that its liability should be different from that existing under *Monell* because its employees were not, prior to 1979, liable under section 1983. Instead, the District argues that the "evidence adduced by plaintiffs in this suit" was simply insufficient to permit an award under the *Monell* standard. *Monell,* and the Court's instruction based upon it, created an issue of fact of whether the District employees' actions were taken with the approval of the government. Plaintiffs argued and offered evidence that use of *agents provocateurs* and other plainly illegal conduct were common in the Intelligence Division. Counsel for the District were content to rest their defense principally on an MPD General Order that blandly stated that the Intelligence Division's legitimate duties in the relevant period were to anticipate and deter unlawful disruptions within the District of Columbia. The jury was entitled to find that, despite that MPD directive, illegalities that injured plaintiffs in the exercise of their First-Amendment rights did occur, and were municipal practice, approved in the manner contemplated by the *Monell* Court. Given the record in this case, the Court cannot disturb the jury's judgment that some of the District employees' conduct was conduct executing the local government's policies and customs.

The jury found that the District government was liable for the participation of its employees in the conspiracies plaintiffs proved to have existed within the MPD and between MPD and FBI personnel. The Court could not, in view of the decision in *Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir.1979), *cert. denied,* 444 .U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1980), have withdrawn the issue of municipal conspiratorial liability from the jury on the theory that the District government is not a "person." Moreover, defendant has, at no stage of this litigation, objected to the instructions as impermissibly permitting a verdict of conspiratorial liability against itself because it is not a "person" within the meaning of 42 U.S.C. § 1985(3). Corporation Counsel's argument regarding the applicability of section 1985(3) to the District government was limited to the question, discussed at pp. 1166–1167 *supra,* of whether the District falls within the geographical terms of the statute that makes actionable certain conduct within "any state or territory." Defendant made no attempt to disturb the Court's decision to rely on the holding in *Owens v. Haas* that a municipal corporation is a "person" for purposes of 42 U.S.C. § 1985(3); indeed, Corporation Counsel did not cite *Owens v. Haas* on any question related to section 1985(3). To open this issue at this late stage of this protracted case would be contrary to considerations of fair and orderly trial administration. *Cf. City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 2754 n. 11, 69 L.Ed.2d 616 (1981). *See generally Monell v. Department of Social Services, supra* (municipal corporation a "person" within meaning of 42 U.S.C. § 1983); *but cf. Owen v. City of Independence, supra* (municipal corporation incapable of satisfying prerequisites for "good faith" immunity).

---

**22.** The Court of Appeals decided *Dellums v. Powell* prior to *Monell,* and expressly based the theory of municipal liability it employed on what the Court of Appeals termed "*respondeat superior*" liability predicated on the liability of various employees. While the use of classic *respondeat superior* vicarious liability has been precluded by *Monell,* the broader significance of *Dellums* for this action remains: if the District should have been liable vicariously for the acts of its employees in *Dellums,* it follows that, in the wake of *Monell,* municipal responsibility should attach to actions of its employees that it "approved" and that injured plaintiffs in the exercise of their constitutional rights. There is simply nothing in the special status of the District of Columbia that would require—or permit—a unique rule to govern constitutional torts committed by District employees who are themselves liable on a *Bivens* rationale. *See* 184 U.S.App.D.C. at 332–33, 566 F.2d at 224–25.

## III. The Statute of Limitations

In September 1981 the FBI defendants sought judgment on the pleadings based upon the statute of limitations. Plaintiffs, the FBI defendants claimed, had failed to commence suit upon their rights of action within three years from the time those rights accrued, and the longest statute of limitations that might apply to the claims in this case was three years. Plaintiffs replied to defendants' motion by seeking benefit of the doctrine of fraudulent or deliberate concealment. Plaintiffs alleged that the FBI and MPD defendants had deliberately concealed their program of disruption in the late 1960's and early 1970's from the public and from plaintiffs, and that consequently plaintiffs could not, through the exercise of due diligence, have learned the material facts necessary to commence the lawsuit within three years of the injuries they suffered. Defendants, however, offered in support of their motion newspaper and magazine articles from the early 1970's that, according to defendants, should have provided plaintiffs with the material facts needed for commencement of suit; defendants also offered statements by various plaintiffs at depositions that they knew someone was either observing their activities or harassing them, and that they had, as early as 1968, considered suing government officials in response. Plaintiffs opposed the motion for judgment on the pleadings with evidence that the FBI and MPD had attempted to maintain strict secrecy about COINTELPRO and the MPD's anti-protest activities. Not until 1976, they argued, after the hearings of the Church Committee and the inquiries of the D.C. City Council, did they possess the information they needed to sue in vindication of their First-Amendment rights.

 The Court denied the motion for judgment on the pleadings.[23] *See Hobson v. Wilson,* Civil Action No. 76–1326 (D.D.C., Oct. 29, 1981). The Court determined that the applicable statute of limitations was the three-year statute in D.C.Code 12–301(8) (1973 ed.), and concluded that issues of fact were presented regarding *inter alia* the state of plaintiffs' actual knowledge of their rights of action on July 16, 1973, the date three years before they commenced this action.[24] As the Court noted, the doctrine of fraudulent or deliberate concealment attaches to every statute of limitations applied in federal-question litigation. *See Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). Issues of this character are not readily susceptible to summary disposition.[25] *See, e.g., Richards v. Mileski,* 662 F.2d 65, 73 (D.C.Cir. 1981); *Smith v. Nixon,* 196 U.S.App.D.C. 276, 283, 606 F.2d 1183, 1190 (1979); *Fitzgerald v. Seamans,* 180 U.S.App.D.C. 75, 83, 553 F.2d 220, 228 (1977); *cf. Emmett v. Eastern Dispensary & Casualty Hospital,* 130 U.S.App.D.C. 50, 396 F.2d 931 (1967); *see also Davidov v. Honeywell Inc.,* 515 F.Supp. 1358 (D.Minn., 1981), at 1361. And if the entitlement to equitable relief under the doctrine of fraudulent or deliberate concealment depends on questions of fact, those issues of fact must be resolved in a damages action by the jury. *See Music Research, Inc. v. Vanguard Recording Soc'y,* 547 F.2d 192 (2d Cir.1976); *cf. Briskin v. Ernst & Ernst,* 589 F.2d 1363 (9th Cir.1978); *Jones v. Rogers Memorial Hospital,* 143 U.S.App.D.C. 51, 442 F.2d 773 (1971).

### A. The Statute of Limitations Instructions

The recent discussion of the order of proof on a claim of fraudulent or deliberate

---

**23.** A similar motion had been denied without prejudice to renewal when this case was assigned to Judge Pratt. *See Hobson v. Wilson,* Civil Action No. 76–1326 (D.D.C., Nov. 9, 1979).

**24.** The Court found that such an application of D.C.Code 12–301(8) to be the law of the case. *See* Memorandum and Order of October 29, 1981 at 2. Judge Pratt's prior Order, while

denying the earlier motion without prejudice to renewal, unequivocally decided that the three-year statute was the longest that might apply to plaintiffs' claims.

**25.** A plaintiff may, for example, have known his telephone was bugged, or that agents were watching him, without knowing of the conspiracy to disrupt First-Amendment activities.

concealment in *Richards v. Mileski, supra,* together with the seminal decision in *Fitzgerald v. Seamans, supra,* provided the basis for the instructions to the jury. The Court of Appeals in *Fitzgerald v. Seamans* established that a plaintiff's knowledge that some defendants were responsible for his injury did not necessarily mean that the plaintiff would have had sufficient knowledge of other defendants' involvement intelligently to have prosecuted his claims against the others. *See* 180 U.S.App.D.C. at 84, 553 F.2d at 229. In *Richards v. Mileski* the Court of Appeals determined that a plaintiff's knowledge that the defendants had injured plaintiff through false accusations that he was not suitable for a job was not equivalent, for purposes of the doctrine of fraudulent or deliberate concealment, to knowledge that those same defendants knew the accusations were false, and that the defendants were involved in a conspiracy to use the accusations against the plaintiff and to conceal their falsehood.

Because the present case involved so many parties and so many particularized allegations of injury, the jury's task was formidable: it had to determine, with respect to each claim, whether a particular plaintiff was, as to a particular defendant on that particular claim, barred from suit by the statute of limitations. As the Court explained that task to the jury, it was necessary first to determine whether the plaintiff had sufficient actual knowledge of his right of action to have intelligently prosecuted it more than three years before the commencement of suit. If he did not, the plaintiff still had the burden of proving that the defendant who had raised the limitations defense deliberately concealed from him those material facts needed for intelligent prosecution. If the plaintiff succeeded in that proof, the defendant then had to prove that plaintiff could nevertheless have discovered the necessary facts within three years of the accrual of the right of action through the exercise of due diligence. *See Richards v. Mileski, supra,* 662 F.2d at 69–72.

Defendants in their motions for a new trial assert that the instructions on the statute of limitations were defective in two respects. First, defendants insist that the jury should have been told that "mere silence by a defendant is not fraudulent or deliberate concealment." Second, defendants argue that the Court erred in instructing the jury that deliberate concealment to serve "law enforcement considerations" defined by the FBI or MPD might—or might not—be the type of concealment against which the equitable doctrine could provide relief. According to defendants, the Court's instruction on that point contradicted "the principle that concealment by a third party may not be attributed to the defendant" and "the principle that the concealment must have been wrongful."

■ Turning to the second objection first, the instructions did not violate either of the "principles" that defendants recite. The Court did instruct the jury that the defendant or (with respect to conspiracy claims) the defendant's co-conspirators must be proved to have engaged in concealment of the relevant facts. The Court then defined "deliberate concealment" in these terms:

"By deliberate concealment, I mean that defendant or a conspiracy to which a defendant belonged deliberately kept information away from a plaintiff which was material to that plaintiff's claim. It is immaterial whether the defendant or conspiracy kept the material [sic] from plaintiff because the agency employing the defendant or the conspirators believed that law enforcement considerations required concealment, or whether the material facts were concealed for the purpose of impeding plaintiffs' prosecution of their claims."

Such an instruction seemed essential in avoiding unnecessary complexities of motive in cases of this type. Defendants were alleged to have engaged, over a long period of time, in clandestine disruptive activities; at the time they did so, defendants assumed their efforts would remain covert. The secrecy of their operations obviously would have been violated by civil litigation as

surely as it would have been by publicity of any other sort. Defendants, if they did engage in deliberate concealment, could thus have rationalized their conduct either as required for a "law enforcement purpose," or to protect themselves from liability in damages. Indeed, because secrecy was so important to their missions, it could have seemed to defendants that "law enforcement considerations" themselves required concealment "for the purpose of impeding . . . prosecution" of civil complaints. Like the schemes in *Smith v. Nixon, supra,* and *Fitzgerald v. Seamans, supra,* concealment of defendants' activities in this case was of the essence; it would be impossible for a trier of fact in this case to have determined that the official wrongdoers concealed their operations, not in furtherance of their disruptive objectives, but exclusively to protect themselves from litigation. If, as defendants appear to argue, no concealment for such a "law enforcement" purpose as that they invoked in this case can ever be "wrongful," then there would have been no basis for the determinations in *Smith v. Nixon* and *Fitzgerald v. Seamans* that the plaintiffs in those cases might have been entitled to equitable relief from the statute of limitations. Accepting as true the general proposition that concealment must be "wrongful," *see General Aircraft Corp. v. Air America,* 482 F.Supp. 3 (D.D.C.1979), the "wrongfulness" in this case, like that in the *Nixon* and *Fitzgerald* cases, consisted of defendants' effort to conceal COINTELPRO and the MPD activities from the public despite the unlawfulness of the FBI and MPD programs.[26]

■ Defendants' other objection, that the Court erred in not instructing the jury that "mere silence" is not fraudulent or deliberate concealment, is also off the mark. To have instructed the jury in this case that "mere silence" might not be "concealment" for purposes of the limitations defense would have risked confusion. The bare concept of silence is inherently difficult to apply. What matters is not some distinction, always difficult to draw, between action and inaction (or "silence") but the deliberateness of a defendant's conduct in foreclosing discovery of the facts a plaintiff would need to prosecute his claim against that defendant. *See Smith v. Nixon, supra,* 196 U.S.App.D.C. at 283, 606 F.2d at 1190. In *Richards,* it was enough that the defendants had published the false reports and then held their peace, knowing the reports to have been false. *See* 662 F.2d at 69–70. In this case, defendants assumed false identities as protesters, as students, and as parade coordinators, or they conducted their operations in a manner otherwise calculated to conceal their official status. They maintained, as far as they were able, secrecy about their undertakings. Such conduct is functionally indistinguishable from that in *Smith v. Nixon, supra.* The jury had to be given an opportunity to decide whether what transpired here was not "mere silence" (as defendants characterize it), but instead was "silence" observed by defendants as a strategy for concealment that prevented a timely claim.

■ Finally, defendants object to the placement of the limitations issue on the special verdict form as the third principal issue for the jury's decision. According to defendants, since the statutory defense bars a claim, it should have been placed first on the special-verdict form, ahead of the questions that required the jury to determine whether any plaintiff had been injured. The Court placed the limitations issue after the injury issues in order to ensure that the jury could make its findings on the statutory defense in the manner contemplated by *Fitzgerald v. Seamans* and *Richards v. Mileski* without undue confusion. The entitlement to equitable relief may, with respect to a particular plaintiff, vary among the plaintiffs' different claims—as in *Richards* —or among different defendants—as in *Fitzgerald.* It would thus have been difficult for the jury to determine which claims were barred, and against which defendants,

---

**26.** Because the instructions required that concealment *vel non* be attributable to the defendant or (with the conspiracy claims) to the overall design of the conspiracy, they would not have permitted verdict based impermissibly on what defendants call "third party" conduct.

until it had first isolated for itself the specific allegations each of the nine plaintiffs made. It was therefore better practice to confront the jury with the basic questions of injury *vel non* first, inasmuch as those questions would, once framed and answered, provide the context for the questions posed by the statute of limitations. In any event, assuming the instructions were not erroneous, there is no indication that the verdicts were affected by the order in which the special form presented the questions for the jury's decision.[27]

B. *The proof regarding the limitations defense*

Defendants also argue, in their motions for judgment n.o.v., that the proof adduced at trial was insufficient to entitle plaintiffs to relief from the statute of limitations. According to defendants, there was conclusive evidence that plaintiffs knew of the existence of their rights of action prior to July 16, 1973. Defendants also assert that plaintiffs failed to provide adequate evidence of fraudulent or deliberate concealment, and that the evidence showed that the plaintiffs might through the exercise of due diligence have discovered whatever information they needed to commence suit within three years of their injuries. The Court has concluded, however, that the evidence on the relevant issues of fact was not so clearly in defendants' favor as to entitle them to relief under Rule 50. *See Vander Zee v. Karabatsos, supra; see also Pan America Petroleum Corp. v. Orr,* 319 F.2d 612, 614–15 (5th Cir.1963).

If a plaintiff has actual knowledge of facts that would have permitted him intelligently to have prosecuted a given claim against a defendant more than three years before he actually filed suit, the claim based on those facts is barred. *Fitzgerald v. Seamans, supra; cf. United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In this case there was highly credible evidence, much of it drawn from depositions of plaintiffs at the earliest stages of the litigation, that plaintiffs strongly suspected official misconduct long before they commenced suit. Certain plaintiffs even admitted that they had discussed among themselves the possibility of suing the government, long before July 16, 1973, and prior to the Church Committee hearings or the D.C. City Council investigations. Certain plaintiffs admitted having read articles published in New York and Washington on "secret" FBI efforts to disrupt protest organizations. The articles specifically mentioned the "Head Tax" scheme, one of the COINTELPRO programs that some plaintiffs alleged injured them.[28] Other plaintiffs admitted to strong suspicions, sometimes confirmed by conclusive information obtained by them prior to July 1973, that some of their anti-war associates were in fact undercover police officers. On the other hand, the evidence did not establish precisely how much the plaintiffs who suspected that they were victims of official interference knew about COINTELPRO or the MPD's activities. Plaintiffs' suspicions were, it appeared, more often vague than

27. It bears noting that defendants, even though they object to the order of questions on the special verdict form, did not object to the Court's preliminary instructions to the jury that stated the limitations defense after the issue of primary injury. Moreover, it bears noting that the Court advised the jury of the important beneficial purposes of the statute of limitations.

28. According to plaintiffs, in 1969 and 1970 FBI agents attempted to exacerbate disagreements among anti-war and civil-rights activists regarding a proposal that anti-war protesters contribute money to help rebuild Washington after the 1968 riots and to support civil-rights causes. At its inception, a proposal originating with protesters of both races in anti-war and civil-rights groups called on all anti-war organizations to contribute various sums, possibly based upon the level of black attendance at anti-war rallies, to civil-rights and "Black Pride" groups for use in the community. Subsequent disputes regarding that so-called "Head Tax" proposal were intense. According to plaintiffs' evidence, FBI agents who learned of the disputes from their informants attempted to inflate the disagreement by planting suggestions that the anti-war groups pay large lump sums to organizations like the Black United Front. Defendants vigorously denied any involvement in such a scheme.

specific. They seem to have had more knowledge of official surveillance—itself perhaps not unlawful[29]—than of concerted efforts to disrupt their protest activities. And there was ample evidence from which the jury could find that most of the Church Committee's findings provided plaintiffs their first credible account of the conspiracies they alleged.

The jury apparently segregated some claims that it deemed statute-barred from others that it considered not to be barred in a way that lends strong credibility to its overall findings on the statute of limitations issues. *See Richards v. Mileski, supra; Fitzgerald v. Seamans, supra.* The jury found, for example, that any otherwise valid claims against two of the defendants, the undercover officers Bynum and Markovich, were barred by the statute of limitations.[30] There was considerable support in the evidence for those findings. By virtue of those two defendants' infiltration of the protest organizations, the plaintiffs who might have been injured by those two defendants associated closely with Bynum and Markovich. The jury could reasonably have concluded that those plaintiffs either had actual knowledge of the two undercover officers' roles, or could through the exercise of due diligence have discovered their roles, long before July 16, 1973. Indeed, there was evidence that at least one plaintiff had positive evidence that Markovich was a police officer prior to July 1973. But the jury's finding that the claims against Bynum and Markovich were statute-barred did not require a finding that claims against the other defendants, even for the same injuries, were statute-barred. The jury could have determined, under the rule in *Fitzgerald v. Seamans, supra,* that the plaintiffs' actual knowledge of the undercover officers' activity could not reasonably have been expected to give them an awareness of misconduct elsewhere within the

Intelligence Division or within the FBI. Far from being evidence (as the MPD defendants argue) of "inconsistent verdicts," the jury's distinction between claims against the undercover officers and the other MPD Intelligence Division defendants thus suggests a careful judgment that should not be disturbed. Finally, it bears noting, in connection with the verdicts against the other defendants, that the jury may well have found certain claims against them to be statute-barred while it found others not to be barred. *See Richards v. Mileski, supra.* The Court's present task is at an end if it appears from the verdicts and the evidence that the jury could have reasonably found that some claims against a particular defendant were not statute-barred, and that question is easily answered in the affirmative. The jury was entitled to credit the evidence that prior to the spring of 1976 plaintiffs had no awareness, nor could they be expected to have had awareness, of the central connections among the various attacks upon them.

Defendants' challenge to the proof regarding concealment and due diligence is even less powerful than their assertion that plaintiffs had actual knowledge of the material facts more than three years before the commencement of suit. Plaintiffs had the burden of proving concealment of the material facts and they offered considerable evidence in support. There was evidence of the scope and intensity of the FBI's attempts to ensure that COINTELPRO remained secret. There was evidence that the District of Columbia had destroyed a body of Intelligence Division documents in the 1970's and thereby virtually obliterated much of the record of the activities of the Division. The evidence, taken as a whole, thus supported the jury's findings that plaintiffs could not have discovered the material facts needed to prosecute particular

---

**29.** *See Reporters' Committee for Freedom of the Press v. American Telephone & Telegraph Co.,* 192 U.S.App.D.C. 376, 593 F.2d 1030 (1978); *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976).

**30.** With respect to claims by plaintiff Abbott, for example, the jury found that the various claims against Bynum and Markovich were either barred by the statute of limitations, or should not result in an award of damages because the two defendants were, as to those particular claims, entitled to immunity.

claims. Here, too, the jury may have found that, as to particular claims—the "Head Tax" program, for example—a person could through the exercise of due diligence have discovered the facts needed for suit. But even if the evidence required such a finding on the due-diligence issue as to a particular claim, other claims could survive. Assuredly, the evidence did not compel the jury to find that all the claims a plaintiff had against a particular defendant were discoverable through the exercise of due diligence. The jury's ultimate resolution of the due-diligence issues presented to them therefore will stand.

## IV. Limited Official Immunity

All of the individual defendants sought benefit of the limited official immunity for law-enforcement personnel recognized in *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and later decisions. In their present motion the MPD defendants assert that the evidence compelled a verdict that many of them were immune. The FBI defendants seek relief on the immunity issue only in their motion for a new trial, in which they suggest that the terms the Court used on the special-verdict form to state the immunity question were "inadequate."

■■■ The FBI defendants' objection to the special-verdict form's statement of the immunity issue borders on the frivolous. In lengthy instructions that apparently are not now challenged by any defendant, the Court explained to the jury the criteria for qualified official immunity, and indicated how the jury should record the verdict they reached on the immunity claims. Defendants argue, however, that the Court should have included on the special-verdict form a description of "the concept of good faith immunity." Asserting that "[t]he concept of immunity from liability is not one which a jury of laymen could be expected readily to understand," defendants insist that the special-verdict form should have asked: "Did the defendant believe reasonably and in good faith that his actions were proper?" The purpose of the special-verdict form was to provide a mechanism for the jury to record its findings on the question put to it by the Court; the purpose of the instructions, in whose formulation defendants participated, was *inter alia* to explain the concept of immunity. The criteria for official immunity would, moreover, have required a summary on the special verdict form different from that proposed by defendants. A belief that one's actions were "proper," even if reasonable and characterized by "good faith," obviously will not avail a defendant who does not act within the scope of his authority. *See Procunier v. Navarette,* 434 U.S. 555, 571, 98 S.Ct. 855, 864, 55 L.Ed.2d 24 (1978) (Stevens, J., dissenting); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Of course, the issue of whether these defendants acted beyond the scope of their authority—that is, "for reasons unrelated to the performance of their duties," *see* 434 U.S. at 571, 98 S.Ct. at 864—was clearly not as important in this case as the question whether they acted with a reasonable and good-faith belief in the propriety of their actions. But the Court had no basis in this case for withdrawing that issue from the jury in the wording of the special-verdict form. Defendants' proposed formulation might have had that consequence and, in any event, their statement of the immunity issue does not appear to the Court to possess any material advantage for a properly-instructed jury over the formulation the Court employed.

■■■ The MPD defendants argue that, because many of their activities were lawful and specifically authorized by the regulations governing the work of the Intelligence Division, and because they did not know about COINTELPRO, the jury was required to grant them immunity for any injuries they inflicted on plaintiffs in the exercise of plaintiffs' First-Amendment rights. *See Procunier v. Navarette, supra.* There was considerable evidence at trial touching upon the immunity issue. Plaintiffs offered evidence tending to show that MPD officers, some of them defendants or officers acting in concert with defendants,

burglarized offices of organizations in which plaintiffs were active, attempted to disrupt peaceful protest meetings, and destroyed machinery used by plaintiffs' organizations to reproduce political leaflets. Plaintiffs also offered evidence of regular contacts between Intelligence Division personnel and FBI officials participating in design and execution of COINTELPRO schemes; such evidence could have provided a basis for a finding that the MPD defendants knew enough about COINTELPRO to know that the information they gave the FBI would be used to disrupt and discredit plaintiffs' political activities. Defendants, however, denied any involvement in any activity not specifically authorized by law or Intelligence Division practice, and denied any knowledge of any aspect of COINTEL-PRO. Based upon that evidence, the jury found some defendants to be immune on certain claims of various plaintiffs, and denied immunity on other claims. The Court cannot say that the evidence that all defendants believed their conduct to be lawful, and that such a belief was reasonable under the circumstances confronting defendants, was so decisive that it would permit the Court to overturn the verdicts. In particular, the strong evidence of burglary committed by MPD officers, and the evidence that various defendants knew of the burglary, contradicted defendants' claims that they believed in good faith and with good reason that their conduct was lawful: no regulation of the MPD relieved the Intelligence Division from the requirement of search warrants.

The jury did, on the other hand, find some MPD defendants to be immune from liability for injuries they inflicted on some plaintiffs. The jury's findings that certain defendants should be immune from liability on certain claims was not, as the other MPD defendants now argue, inconsistent with the jury's other findings that different defendants were not immune.[31] Defendants like Bynum and Markovich, the two defendants whom the jury found most often to be immune from liability in damages, offered detailed justifications for their conduct during their testimony. It was not unreasonable for the jury to see a difference in the belief those officers maintained concerning the lawfulness of their work, and in the reasonableness of that belief, from the belief the other, higher-ranking defendants within MPD may have possessed. Moreover, the jury also found the other MPD defendants, with the exception of defendants Wilson and Herlihy, to be immune from at least some of the claims against them by particular plaintiffs. Wilson and Herlihy were the highest-ranking officers in the MPD group of defendants. Wilson and Herlihy may also have been in the best position to know the law and the facts that might have indicated that the MPD's activities were violating plaintiffs' First-Amendment rights. The Court cannot say that the jury's possible recognition of such a hierarchy of responsibility was insupportable on

**31.** The jury found defendants Bynum and Markovich to have been participants in a section 1985(3) conspiracy, and yet also accorded them immunity. Defendants, while arguing that the verdicts were inconsistent because some of them were accorded immunity while others were not accorded immunity, have not suggested that the verdicts were infirm because Bynum and Markovich were found both to have been knowing participants in an actionable conspiracy and also entitled to immunity. The jury assuredly trod a narrow line in returning these verdicts. There is, however, adequate basis in the evidence for the distinction the jury drew and, perhaps for this reason, the defendants have not assigned this point as error. The evidence did not compel a finding that Bynum and Markovich acted from malice. They were at the end of the chain of command. There was evidence and inference from which the jurors could rationally conclude that Bynum and Markovich were entitled to rely for approval of their actions upon the direct orders of their superiors. Bynum and Markovich possibly may have shared the discriminatory animus required for participation in the conspiracy, and joined fully in the conspiracy's objectives, and yet could not be reasonably expected (given the peculiar circumstances of their involvement in the MPD's activities) to have known their conduct was unlawful or improper under the First Amendment. *Compare Griffin v. Breckenridge, supra, with Wood v. Strickland, supra, and Bogard v. Cook,* 586 F.2d 399, 411 (5th Cir.1978). Particularly because defendants do not suggest this point as grounds for challenging the verdict, the Court will not disturb the verdicts on this matter.

the evidence adduced at trial. The plausibility of a defendant's claim that he did not know and should not have known about the MPD's involvement in COINTELPRO, or that he reasonably and in good faith believed his own conduct and that of the Department to be lawful, might well depend on the defendant's position with the MPD and within the Intelligence Division.

## V. Admissibility of plaintiff's exhibits

Portions of plaintiffs' proof of their claims against the FBI and MPD defendants came from FBI documents obtained either in discovery in this case or through invocation of plaintiffs' rights under the Freedom of Information Act, 5 U.S.C. § 552. In their motion for a new trial defendants object to the admission of certain documents that, in defendants' words, "did not pertain to any defendant, but which could inflame or mislead the jury." *See* Fed.R.Evid. 401–03. Defendants' specific objections pertain to documents that described FBI attempts to discredit leaders of the Black United Front and to exacerbate difficulties experienced by plaintiffs and other protesters in their efforts to coordinate joint activities of the Black United Front and several anti-war organizations. The Court will, in addressing this ground of defendants' motion, also summarize the other main evidentiary problems in the case, so that defendants' present objections may be seen in context.

▆▆▆ During trial, the FBI defendants objected to submission to the jury of excerpts from the Final Report of the Church Committee that described the COINTELPRO operation. The parties reached some agreement about the portions of the Report that might be submitted to the jury.

Adopting the view of Rule 803(8)(C) endorsed by this Court in *United States v. American Telephone & Telegraph Co.,* 498 F.Supp. 353, 359–60 (D.D.C.1980), the Court admitted other segments of the Church Committee's reports proffered by plaintiffs and not covered by stipulation, some of which took the form of factual "evaluative reports" rather than mere compilations of data. *See United States v. American Telephone & Telegraph Co., supra;* S.Rep. No. 93–1277, 93d Cong., 2d Sess. 18, *reprinted in* [1974] U.S.Code Cong. & Admin.News 7051, 7064. While the admission of "evaluative reports" under Rule 803(8)(C) appears to have been disfavored by the report of the House Judiciary Committee on Rule 803(8)(C), "[e]xtrinsic materials indicate that the Rule is most appropriately considered by following the Senate Committee's position." *See* 498 F.Supp. at 359. *See also Robbins v. Whelan,* 653 F.2d 47 (1st Cir.), *cert. denied,* 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981). The Court thus permitted the jury to have the Church Committee's findings regarding the organization of COINTELPRO, the Committee's summary of COINTELPRO's basic target groups (both drawn directly from internal FBI documents), and similar materials. The segments of the Church Committee Report submitted to the jury reflected adherence to appropriate standards of scholarly responsibility, investigative integrity, and trustworthiness. Indeed, the quality of the Report is perhaps evidenced by the fact that similar portions of the same Report have been relied upon by this Court and in other circuits for the background they have provided in other cases concerning COINTELPRO.[32] *See, e.g., Sims v. CIA,* 642 F.2d 562, 564 (D.C.Cir.1980).

---

**32.** To the extent defendants' objection at trial was based, not on the untrustworthiness of the Report or its assertedly "evaluative" quality, but on some prejudicial effect on the defense of the claims against them, it was not well-taken. The Report was clearly relevant to the claims plaintiffs made against the FBI defendants regarding their participation in COINTELPRO. The Court instructed the jury on the requirement that a defendant be proved to be personally liable, either through participation in a

conspiracy or through non-conspiratorial activity, and on plaintiffs' burden of proving that liability as to any defendant they charged with responsibility for their injuries. Rule 403 itself creates a presumption against exclusion of relevant evidence. If deemed an objection under Rule 403, then defendants' objection to the Church Committee excerpts the Court found otherwise admissible under Rule 803(8)(C) cannot overcome that presumption. *See Miller v.*

The Court also admitted, over defendants' objections, portions of the sworn testimony given by various MPD officials in the course of an investigation of Intelligence-Division wrongdoing, conducted in 1975 and 1976 by Assistant Chief Melvin I. Winkelman and by the United States Attorney for the District of Columbia. The FBI defendants particularly objected to admission of Plaintiff's Exhibit 88, which was an excerpt of a sworn statement by former MPD employee Charles Marcum in which Marcum told the investigators of a covert MPD entry at the offices of protest organizations in which certain plaintiffs were active. According to Marcum's testimony, MPD officers told him they delivered the materials they took from those offices to FBI agents involved in COINTELPRO. In his testimony, Marcum described his own participation in the break-in, and recounted for the investigators' reports he had heard from others that a box of documents taken from the offices found their way to the FBI. The Court admitted so much of the excerpt as constituted an admission against interest by Marcum—who was unavailable for testimony in this action—but excluded from the statements it admitted any segment that consisted of double hearsay. *See* Fed.R. Evid. 804(b)(3), 805.

The FBI defendants also objected at trial to admission of segments of various plaintiffs' FBI files, which were prepared by a number of FBI agents over the course of many years while plaintiffs were under official surveillance. They press that objection in the present motion as well, on the ground that "[n]one of the federal defendants were directly involved in the investigation of any plaintiff," so that the admission of the plaintiffs' files would "permit the jury to consider, and potentially hold defendants liable for, investigative activity which the federal defendants would not have been involved in and would not have known about." The evidence showed that defendants, as agents with roles in implementation of COINTELPRO, were ex-

pected to use all information possessed by the Bureau to develop effective programs of disruption and harassment; indeed, the FBI memoranda that launched COINTELPRO in 1967 and 1968 instructed agents to maintain current files on the targets of COINTELPRO to enhance the effectiveness of the program of disruption. Consideration of plaintiffs' files by the jury could have enhanced the jury's understanding of defendants' efforts to interfere with their First-Amendment rights in the manner intended by COINTELPRO. The files were thus admissible, on their face, under Rule 401.

Defendants argue, however, that consideration of the files would also have had an unfairly prejudicial effect. It is true, of course, that plaintiffs did not establish—nor could they have—that the segments of the files proffered for the jury were all segments that one defendant or another used against a plaintiff in the course of COINTELPRO. But the Court carefully instructed the jury that defendants could be liable only for their own action and for their own knowing participation in a conspiracy, and that intelligence-gathering, including so-called "non-criminal surveillance," was not in itself actionable in this case. *See Reporters's Committee v. American Telephone & Telegraph Co., supra; Berlin Democratic Club v. Rumsfeld, supra; cf. Jones v. Unknown Agents of the Federal Election Com'n,* 198 U.S.App.D.C. 131, 613 F.2d 864 (1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). A court must not exclude relevant evidence when it appears confusion or prejudice can be avoided by instructions. In the present case, to have committed the error defendants suggest, the jury would have had to ignore the Court's instruction that intelligence-gathering and information retention were not a basis for liability in this case. Given the documents' probative value in demonstrating the character of defendants' interference in plaintiffs' activities, there

*Poretsky,* 193 U.S.App.D.C. 395, 408, 595 F.2d 780, 793–94 (1978) (Robinson, J., concurring).

was no justification for exclusion under Rule 403.[33]

Defendants also renew in their motion for a new trial an objection to admission of Plaintiffs' Exhibits 23, 24, 25, 31, and 31A. Exhibits 23, 24, and 25 included a copy of a leaflet, anonymously authored by an FBI agent who was not a defendant, that purported to come from a white anti-war protester angered by demands, attributed to the Black United Front, that the anti-war protesters pay blacks to cooperate in various anti-war activities in which some white plaintiffs participated.[34] The other pages of these three exhibits were FBI memoranda that discussed possible use of the false leaflet and approved its distribution. In Exhibit 24, which bore the names of defendants Brennan and Moore as either originators or addressees, the Director gave permission to distribute the leaflet, whose objective was, according to the memorandum admitted as exhibit 23, "to widen the rift between the New Mobilization Committee ... and the Black United Front." Exhibit 25 apparently accompanied a batch of the leaflets given to the WFO, whose agents were instructed to distribute them to appropriate people in Washington in a manner concealing Bureau involvement. All the FBI defendants denied having ever seen the leaflet or the memoranda, or knowing anything about the leaflet. The Court admitted the materials, however, because plaintiffs offered relatively credible evidence that, given the organization of COINTELPRO within the FBI, such documents would have probably required some review by various defendants; the strongest evidence of such a pattern was, of course, the presence of two defendants' names on the critical document approving distribution of the leaflet. The exhibits were highly probative of several plaintiffs' claims of injury against several defendants. Despite its arguably inflammatory language and graphics of Exhibit 23,[35] which appears to have been intended to portray its author as a white racist who had contempt for the Black United Front, the leaflet could not be withheld from the jury. Defendants remained free to argue that they should have no responsibility for the leaflet, and it was for the jury to decide the ultimate questions of fact raised by that defense.

Exhibits 31 and 31A included another anonymous leaflet, attributed to a member of the National Steering Committee of the New Mobilization Committee, but in fact prepared by the FBI's New York Field Office. That leaflet excoriated the New Mobilization Committee for its insensitivity to the needs of the Black United Front. Exhibit 31 indicated that the leaflet had a purpose similar to that of the leaflet supposedly authored by the white racist anti-war protester and admitted as Exhibit 23. As with the "racist" leaflet, the New York agents who originated the second leaflet proposed that members of the WFO distribute it to best effect in the Washington area. Like the "racist" leaflet, this leaflet was sent to FBI headquarters for approval by the Director. The evidence of involvement by defendants Moore and Brennan in execution of the proposal from New York office is, however, only circumstantial: their names do not appear on the memorandum that originated in New York transmitting the leaflet, and plaintiffs did not proffer a memorandum that, like exhibit 24, evidenced headquarters approval of the proposal from the New York office. On

---

**33.** The Court admitted only segments of plaintiffs' files, and defendants appear to make no suggestion that the evidence was cumulative.

**34.** This was the so-called "Head Tax" scheme. *See* note 29 *supra.*

**35.** Without attempting to suggest which passages of Exhibit 23, if any, would have particularly outraged a reader, the Court will note that the document is replete with racist and scato-

logical references. The leaflet calls one leader of the Black United Front "nothing but a black blackmailer," and warns, "Mr. Moore and his pack or herd or pride or whatever you call a group of bloodsucking animals, are in for a shock." The leaflet then proposes, "[I]f they must get something in return for their nonviolence towards NMC during these days of demonstrations, give them BANANAS [sic]—all they can eat."

the other hand, plaintiffs offered credible evidence that Brennan and Moore had routine oversight of proposals like that from the New York office, and there was evidence that materials routed to them in the course of COINTELPRO ordinarily did not mention them by name, but were simply referenced "COINTELPRO" and addressed formally to the "DIRECTOR, FBI." Plaintiffs also argued that defendants assigned to WFO might have participated in plans to distribute the leaflet prepared in New York, since the New York agents clearly intended that they do so. The proof of liability for any injuries attributable to exhibit 31A was also circumstantial. But plaintiffs' theory of defendants' involvement, at least at the headquarters level, was consistent with the strong evidence of the headquarters defendants' involvement in similar COINTELPRO schemes. And, if the jury believed plaintiffs' assertions that the headquarters defendants had been involved in consideration exhibit 31A, then exhibits 31 and 31A would have been probative of the scope and character of the conspiracy plaintiffs alleged. Moreover, the content of exhibits 31 and 31A was not so inherently offensive as significantly to risk distortion of the jury's sense of fairness. As its base the only ground for defendants' objection to admission of exhibits 31 and 31A was that proof of their participation in the scheme the exhibits described was circumstantial rather than direct. Article Four of the Evidence Rules does not preclude introduction of circumstantial proof. *Cf. Miller v. Poretsky, supra.* The probative value of the exhibits outweighing any possible prejudicial impact, the Court admitted them, and cannot now say that their admission is a ground for a new trial.

## VI. The motion of defendant Jones

[31, 32] In a motion for judgment n.o.v. stating grounds unique to his defense, defendant Jones renews his argument before trial that he was entitled to involuntary dismissal of the claims against him under Fed.R.Civ.P. 41(b) or, in the alternative, to

a continuance of trial on the claims against him. In the present motion Jones contends that plaintiffs so substantially delayed service of the amended complaint naming him as a defendant that he was prejudiced in his defense, and that dismissal under Rule 41 should have occurred before trial even in the absence of affirmative evidence of prejudice.

Jones was not named as a defendant in the first complaint filed by plaintiffs in July 1976. By 1977, however, once discovery had begun, plaintiffs learned of Jones' role in the "internal security" activities of the WFO, and apparently believed him to have injured them in connection with COINTELPRO effort at the WFO. Accordingly, plaintiffs included Jones as one of the FBI defendants named in the amended complaint filed late in 1977. Plaintiffs thereupon made several attempts—attempts whose good faith is not questioned here—to serve Jones with the papers. First plaintiffs attempted service of Jones at the WFO; later they left the papers at his residence in the Virginia suburbs. In December 1978, Jones, pursuant to 28 C.F.R. § 50.15 (1977), requested appointment of counsel for him by the Department of Justice. The Department, granting the request, assigned the lawyer who was representing all the other FBI defendants in the case to Jones.[36]

In 1979, defendant Jones, together with defendant Wilfred R. Schlarman, moved for dismissal of the claims against them. As Judge Pratt, to whom this case was then assigned, summarized their motion, defendants asserted that, as to themselves, "service of process was not effected upon a person of 'suitable age and discretion' at their homes in accordance with Rule 4(d)(1) of the Federal Rules of Civil Procedure. For both defendants, service was not made upon the defendants personally or upon any other individual." *Hobson v. Wilson,* Civil Action No. 76–1326 (D.D.C., Nov. 9, 1979), slip op. at 7. Judge Pratt granted the motion without prejudice to fresh attempts to serve process. *See id.* at 8; Local Rule

36. That lawyer has represented all the FBI defendants since the beginning of the case.

1–14. After the case had been reassigned to the trial judge in September 1980, the Court directed the parties to "propose a practical solution for the problem posed by the failure to effect service on a number of defendants," including defendant Jones, who had still not been served. See Order of November 14, 1980. At status calls held in late 1980 and in January 1981, the Court discussed the failure of plaintiffs to serve Jones and other defendants; however, counsel for the "served" FBI defendant declined to take any action, claiming not to represent those unserved defendants and because those defendants "are not under the personal jurisdiction of the Court." See Letter of David H. White (dated November 25, 1980), filed as Attachment to Order of December 8, 1980.

On June 21, 1981, plaintiffs perfected service of process upon defendant Jones after having successfully subpoenaed him for a deposition in this case earlier in 1981. Under Pretrial Orders then in effect, discovery in the case was to terminate at the end of July, 1981, but defendant Jones did not seek an extension of the discovery period.[37] Instead, on August 30, 1981, defendant Jones moved for dismissal of the claims against him inter alia for failure to prosecute. Jones argued he would be unfairly disadvantaged by trial in the fall of 1981, and that plaintiffs' failure to serve him in a more timely fashion was willful and inexcusable. On October 29, 1981, the Court denied Jones' motion to dismiss. Addressing the claim under Rule 41, the Court wrote in the Memorandum of October 29:

> Jones' suggestion that the claims against him should be dismissed for failure to serve process in a timely fashion must ... be rejected, inasmuch as he will suffer no prejudice if plaintiffs are precluded from raising any claim against him not stemming from acts already involved in the litigation against other defendants who are represented by Jones' counsel, and who were with Jones in the Federal Bureau of Investigation at the time of his allegedly unlawful conduct. Counsel for Jones is invited to submit with his pretrial brief an appropriate order concerning claims to be precluded.

*Hobson v. Wilson,* Civil Action No. 76–1326 (D.D.C., Oct. 29, 1981), slip op. at 5.

Jones' FBI counsel never submitted the proposed order sought by the Court. Instead, on November 17, 1981, Jones moved for reconsideration of the decision of October 29, 1981, and FBI counsel sought to withdraw from representation of Jones. The latter motion was expressly premised on a belief, supposedly based upon the language from the October 29 Memorandum quoted above, that the only reason the Court denied the Rule 41 motion was the fact that Jones shared FBI counsel with other previously-served defendants. At a status call on November 20, 1981, another member of the District of Columbia bar made a limited appearance on Jones' behalf, in the event the Court granted FBI counsel's motion, and indicated, in papers filed on the eve of trial, an intention (if he entered the case as counsel for Jones) to file a third-party complaint against the United States and to seek continuance of the trial date set in the Court's Order of August 14, 1981. The Court denied Jones' FBI counsel's motion to withdraw, informed counsel who made the limited appearance that he had leave to enter a general appearance and to appear on Jones' behalf at trial, and rejected the motion for reconsideration of the October 29 Order. Jones' FBI counsel still did not file the proposed order sought in the October 29 Order, and counsel who had made the limited appearance on Jones' behalf appeared not to take an active role in court on Jones' behalf.

In the present motion, Jones, through his FBI counsel, renews his argument that dismissal under Rule 41 was required, and asserts that denial of his motion prejudiced his defense. In the relatively unusual circumstances of this case, it may well be that plaintiffs' counsel have displayed unusual indifference to the requirements of service

---

**37.** Plaintiffs, in connection with discovery problems unrelated to Jones and his defense, sought and obtained from the Court several extensions of the discovery termination date.

of process. But the Court has a larger responsibility to ensure fair and orderly trial. A defendant, positioned as defendant Jones was within the group of FBI defendants and possessing actual knowledge of the claims against him, should not exploit the technical defects of a plaintiff's service of process to force upon the Court the difficult question of whether to bar suit against him, or whether to grant a continuance whose practical impact would be tantamount to the barring of suit. Jones' argument now appears to be that nothing short of complete dismissal—or an extensive continuance—would have sufficed, because, from the time he was dismissed from the action in late 1979 until service was perfected in the spring of 1981, he was entitled to assume plaintiffs had lost interest in prosecution of their claims against him. But the extent of the delay in service in this case requires the Court to determine, with some precision, whether Jones was in fact prejudiced by the late service of papers. *See Messenger v. United States,* 231 F.2d 328 (2d Cir.1956). In a case such as this, involving common counsel and a movant who was well-placed to know of the progress of the litigation and perhaps to be involved in the defense, the Court should "assess the prejudice *vel non* suffered by [the movant] rather than ... the degree of the plaintiff's 'neglect' as to that defendant." *Bersch v. Drexel Firestone, Inc.,* 389 F.Supp. 446, 464 (S.D.N.Y.1974), *rev'd in part on other grounds,* 519 F.2d 974 (2d Cir.1975); *see also Preston v. Mendlinger,* 83 F.R.D. 198, 199–201 (S.D.N.Y.1979). And, since defendant's argument is based ultimately on a claim of unfair surprise, the Court ought to examine carefully the steps Jones took once he was served with the papers in June 1981. His claim that he lost the opportunity to engage in discovery is difficult to maintain, since he did not either seek discovery beyond that already pursued by his fellow FBI defendants or request an extension of the discovery period to plan and then obtain additional discovery. And his claim that it was in a larger sense "unfair" to have put him to his proof on claims plaintiffs had taken years to develop ignores his own failure to pursue the Court's proposal in October 1981 that various claims against him be precluded. It also seems improbable that Jones could not have anticipated, prior to the eve of trial, the need to seek a continuance of trial on the claims against him.

The Court cannot find in the circumstances of Jones' defense as it developed at trial the kind of prejudice that could have justified the extreme remedy that Rule 41 sometimes permits. The policies of fairness embodied in Rule 41 must be enforced. *See Link v. Wabash Railroad Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *Anderson v. Air West,* 542 F.2d 522 (9th Cir.1976). But federal civil procedure favors disposition of claims on their merits. *Keegel v. Key West Trading Co.,* 200 U.S.App.D.C. 319, 320–21, 627 F.2d 372, 373–74 (1979). It was not apparent from the trial that defendant Jones was in any way prejudiced in his defense: like the other four FBI defendants, Jones was ably represented by the counsel appointed for him in December 1978 by the Department of Justice. While the nature and degree of each FBI defendant's responsibility for the injuries plaintiffs alleged surely differed, Jones, as a litigant, appears to have fared no better, and no worse, than the other FBI defendants. There was no adequate basis shown for dismissal of the claims in October 1981; there was no basis for a continuance of trial shown in November 1981. And there is no basis now for grant of judgment n.o.v. to defendant Jones.

VII. Plaintiffs' Contact with Dismissed Jurors

During the lengthy trial of this action the Court had occasion to discharge several members of the panel selected for service on the jury and to seat alternates in their places. It appears that, following the close of the evidence on December 14, 1981, but prior to delivery of closing arguments to the jury, one of counsel for plaintiffs contacted a person who had sat on the jury in the early days of trial but who had been discharged on December 3, 1981. Plaintiffs' counsel apparently discussed with the dis-

missed juror her view of the case and the evidence on the telephone on the afternoon of December 14.[38] On December 18, 1981, the Court examined the dismissed juror in proceedings on the record in Chambers and invited questions from counsel. The next day the lawyer for plaintiffs who had contacted the jurors made a statement on the record, and the Court again invited questions from counsel. FBI defendants thereupon moved for a mistrial, and the MPD defendants later joined in the motion. The motion was denied. In their present motions all defendants seek a new trial based upon plaintiffs' contact through their counsel with the discharged jurors.

It appears from the statements of plaintiffs' counsel and the discharged juror whom they succeeded in contacting and questioning that that discharged juror freely offered her opinions regarding the evidence she had heard and also described the opinions she perceived the other members of the panel to hold. The discharged juror, in having the conversation with plaintiffs' counsel, must have misunderstood or forgotten the Court's instructions to her at the time of her discharge, that she not discuss the case with anyone "on the outside." Plaintiffs' counsel may have also misunderstood or forgotten the Court's instructions to the discharged juror. The matter is now the subject of an inquiry by the Disciplinary Committee of this Court, initiated by the Assistant Attorney-General for the Civil Division. The question here must be whether plaintiffs' counsel's disregard of the Court's instruction to the dismissed juror, and of the general standards that should control any contact by counsel with jurors in any case,[39] constitutes grounds for a new trial. The rule that should govern remains that established in *Mattox v. United States,* 146 U.S. 140, 147–50, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892), which sets up a presumption that any contact of this character should invalidate a verdict unless its harmlessness can be shown. "A trial judge should not hesitate to grant a new trial where there is any significant doubt whether the presumption of prejudice has been overcome." *Ryan v. United States,* 191 F.2d 779, 781 (D.C.Cir.1951), *cert. denied,* 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1952).

Leaving to the appropriate forum the question of whether disciplinary action is indicated in this case, the Court has determined that a new trial should not be granted on this ground. The parties had rested at the time of the contact with the dismissed juror. There was no longer an opportunity for plaintiffs to have conformed their proof to the advice of the dismissed juror. The only direct effect her advice could have had would have been on design of closing statements, and perhaps in final argument to the Court regarding the Court's instructions to the jury. The information plaintiffs gained had no impact at all on the Court's instructions, and apparently no effect on plaintiffs' requests in connection with the instructions. The only discernible effect the conversation with the discharged juror appears to have had on plaintiffs' closing was on plaintiffs' discussion of the statute-of-limitations issues in their closing. Perhaps because the dismissed juror had told plaintiffs' counsel that she believed the limitations defense to be difficult to understand, plaintiffs' counsel took pains to emphasize the basic simplicities of the defense. That is, however, the only possible effect on the trial that the Court's inquiries have disclosed, and even it is highly speculative. And there is no suggestion that counsel's argument on the limitations was in itself inappropriate in any concrete way. Defendants' counsel had ample opportunity to answer plaintiffs' argument on the limitations issue, and they did so. Even if it is assumed that plaintiffs' counsel formulated their closing argument,

---

**38.** Plaintiffs' counsel did not inform the Court or opposing counsel of her intention to contact the dismissed juror. It was only when another dismissed juror informed staff of the Court in the Jury Lounge that plaintiffs' counsel had unsuccessfully tried to reach him on the telephone that the matter came to light.

**39.** *See* Local Rule 1–28.

perhaps particularly that touching the limitations defense, with the discharged juror's comments in mind, the Court finds there was no prejudicial impact on the jury's verdicts stemming from the incident.

## VIII. Damages

The jury, having found particular defendants liable to the plaintiffs, awarded sums of compensatory and punitive damages amounting to $93,750 to each of five plaintiffs and $81,062.50 to each of the other three prevailing plaintiffs; individual defendants' liability ranged from $75,000 to $9,375. The jury's award may be summarized on the following table, which identifies the three prevailing plaintiffs who received the lesser sum as "Group 1 Plaintiffs" and the five who received the greater sum as "Group 2 Plaintiffs."

| | Each Group 1 Plaintiff (Booker, Eaton, Hobson) | Each Group 2 Plaintiff (Abbott, Bloom, WPC, Pollock, Waskow) |
|---|---|---|
| Brennan * | $9375 | $9375 |
| Moore * | $7500 | $7500 |
| Jones * | $5625 | $5625 |
| Grimaldi * | $4687.50 | $4687.50 |
| Pangburn * | $5625 | $5625 |
| Wilson * | $5625 | $5625 |
| Herlihy * | $4687.50 | $4867.50 |
| Acree | – – – – | $2562.50 |
| Scrapper | – – – – | $3125 |
| Jagen | – – – – | $2562.50 |
| Suter | – – – – | $2562.50 |
| Mahaney | – – – – | $1875 |
| District of Columbia | $37973.50 | $37937.50 |

\* Award includes punitive damages (one-third of total award). *See* page 1165 *supra.*

---

The sharp graduation in the amounts the jury fixed reflects the jury's judgment, based upon the Court's instructions and the evidence, regarding the extent of the injury suffered by plaintiffs and the measure of each defendant's responsibilities for those injuries.

In the present motions defendants make numerous objections to the jury's awards. Defendants argue that the awards were excessive and against the weight of the evidence; that the awards reflect an impermissible mathematical proportionality that reveals their arbitrariness; that punitive damages should not have been awarded at all; and that the award against the District of Columbia was wholly out of proportion to any other awards and thus was particularly arbitrary. In addition, the FBI defendants assert that the Court erred in not instructing the jury that the United States itself would not pay an award against the federal defendants. The District of Columbia defendants also argue that the Court's instructions and the special-verdict form permitted the jury to grant an impermissible "multiple" award against several defendants for a single injury, and therefore allowed double, or more than double, recoveries.

█ The Court's instructions on compensatory damages were based principally on the two critical decisions of the Court of Appeals on First-Amendment damages: *Tatum v. Morton,* 183 U.S.App.D.C. 331, 562 F.2d 1279 (1977), and *Dellums v. Powell,* 184 U.S.App.D.C. 275, 566 F.2d 167 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978). As the Court advised

the jury, compensatory damages embrace proven out-of-pocket damages and a fair and reasonable amount for any proven physical pain, mental suffering, and for the intangible, though nonetheless real, loss of First-Amendment rights of speech, assembly, protest, and association. *Dellums v. Powell, supra,* 184 U.S.App.D.C. at 302–04, 566 F.2d at 194–196; *Tatum v. Morton, supra,* 183 U.S.App.D.C. at 334–37, 562 F.2d at 1281–85; *id.* 562 F.2d at 1285–87 (Wilkey, J., concurring). The Court took pains to inform the jury that the burden of proof of such actual injury as could be a basis for compensatory damages rested upon each plaintiff. *Cf. Carey v. Piphus,* 435 U.S. 247, 262–65, 98 S.Ct. 1042, 1051–53, 55 L.Ed.2d 252 (1978); *see also Halperin v. Kissinger,* 196 U.S.App.D.C. 285, 300 n. 100, 606 F.2d 1192, 1207 n. 100 (1979), *aff'd by an evenly divided Court,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981). The Court also instructed the jury that, "insofar as it seeks to compensate intangible losses of First-Amendment rights, your award must be proportioned to the loss actually suffered by a plaintiff" whose exercise of First-Amendment rights the defendant was found to have impeded. *See Dellums v. Powell, supra.*

■■■■■■ Turning first to the objections to the instructions and to the verdict form, there is no merit in the federal defendants' claim that they were entitled to an instruction that the United States would not pay a judgment against them. There was no trace of evidence, in plaintiff's case or in defendants' case, regarding possible disposition of judgments against these active and retired employees of the United States, and therefore no basis for any instruction on that matter. Defendants were entitled to offer proof of the hardship an award might cause, and to argue hardship to the jury; to a limited extent, they attempted both, and the jury's awards may reflect a judgment regarding those hardships to the extent of the evidence on the issue. Nor is there

merit in the District of Columbia defendants' suggestion that the instructions and verdict form permitted "multiple" recoveries. In cases of this type, there may be some danger of a duplicative award. *See Dellums v. Powell, supra,* 184 U.S.App.D.C. at 317–18, 566 F.2d at 209–10 (Leventhal, J., concurring). The Court therefore instructed the jury to divide the sum it fixed to compensate an injury among all those it found responsible for it, and the special verdict form, with its separate spaces for each defendant, would have dissolved any belief on the jury's part that the damages should not be so apportioned.

The defendants' objection to "rigid arithmetical calculation" in the jury's award of damages possesses, in the abstract, no weight at all. The jury was entitled to apportion damages in accordance with the instructions. Defendants cannot now presume to impeach the awards against them because they reflect particular ratios, or seem to defendants to have been derived in a particular manner. The only question is whether those verdicts were excessive, or obviously irrational in some other way that would entitle defendants to relief from them.[40] The Court turns to that question now, discussing first the jury's award of compensatory damages and then its award of punitive damages.

### A. Compensatory Damages

■■■ Plaintiffs offered extensive evidence of efforts by defendants within the FBI and the MPD to impede the exercise of First-Amendment rights. The evidence included evidence from which the jury could have reasonably concluded that plaintiffs were in fact impeded in the exercise of those rights. The jury was required by the instructions, however, to limit its award of compensatory damages to the injuries actually suffered by plaintiffs in the exercise of their rights; an attempt by defendants to injure the plaintiffs in the exercise of their rights that did not succeed could not have

---

**40.** Defendants point variously to the asserted "disproportionality" of the award against the District government and the equality of the

awards against two federal defendants as indications of irrationality. *See* pp. 1192–1193 *infra.*

been the basis for an award of compensatory damages, and the award based upon a successful attempt to impede First-Amendment activities had to be measured by the degree of defendants' success. Apart from the intrinsic difficulties of placing some monetary value on rights that are so often said to be "priceless," the jury thus had a difficult task in assessing the intangible injuries the plaintiffs suffered: it had to decide how far defendants' plans to disrupt and discredit plaintiffs' activities actually succeeded. A Court must be reluctant to disturb a jury's work of this kind. Valuation of political and dignitary rights is peculiarly within the competence of a jury. Damage actions by political figures for official abuse of power were well-known at the time when our Constitution and the First Amendment were written, and they were tried to juries. See, e.g., Wilkes v. Wood, 98 Eng.Rep. 489 (K.B.1763). But the duty of the trial judge to test a verdict for excessiveness and grant relief from one that oversteps the limits of reasonableness is equally plain. See Collins v. Brown, 268 F.Supp. 198, 201 (D.D.C.1967) (Holtzoff, J.). Discharge of this responsibility has always been "regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right." Virginian Ry. Co. v. Armentrout, 166 F.2d 400, 408 (4th Cir.1948). The Court's function of review is particularly important in public actions like the present one. See Dellums v. Powell, supra, 184 U.S.App.D.C. at 319, 566 F.2d at 211 (Leventhal, J., concurring).

■ There was evidence in this case which supported findings that the defendants' conduct injured plaintiffs by denying them full association with other persons for pursuit of their social and political causes. The full extent of defendants' disruption of the associational privilege recognized by the First Amendment is especially difficult to assess, and so here, as in Tatum v. Morton and Dellums v. Powell, the compensatory award should be "reasonably spacious." See Tatum v. Morton, supra, 183 U.S.App. D.C. at 334, 562 F.2d at 1282. The evidence

did not and could not establish with certainty, for example, how many people were discouraged from participation in the semiannual protests against the Viet Nam War in Washington when defendants diverted protesters to non-existent overnight lodgings, cancelled intercity bus transportation, and interfered with student marshalls' parade communications. Internal memoranda by FBI agents, however, boast of solid successes in deterring anti-war activities. There was, for example, evidence to prove that the attempt to exploit differences between the predominantly white elements (including plaintiffs) of the anti-war movement and black persons in the civil rights movement (including other plaintiffs) delayed collaboration between them and stirred racial distrust for a substantial period of time. There was solid evidence that the unrest thus generated by defendants wasted valuable time and energy and generated considerable anguish, and that plaintiffs were thereby diverted from pursuit of their protest activities.

But to define injury is not to measure it. The jury's quantification of the losses plaintiffs proved to them must be reviewed by the Court. The leading cases provide important guidance. In Dellums, the jury returned verdicts of $7,500 for each member of a class of persons unlawfully removed from the steps of the U.S. Capitol and detained by police during a public rally. The Court of Appeals held that the instructions had failed to provide sufficient guidance to the jury in measuring compensatory damages and reversed the judgments. The Court also concluded that the jury's award was "totally out of proportion to any harm that has been suffered." See 184 U.S.App. D.C. at 304, 566 F.2d at 196. The Court of Appeals noted that the parties might seek, on remand, a determination by the trial judge of appropriate damages on the record at the first trial. 184 U.S.App.D.C. at 304 n. 87, 566 F.2d at 196 n. 87. On remand the trial judge, on the motion of the parties, fixed damages at $750 for each class member based upon a supplemental trial rec-

ord.[41] In *Tatum v. Morton,* on the other hand, the trial court awarded plaintiffs, who had been unlawfully removed from an area near the White House, arrested, and subjected to unjustifiable rough treatment by police officers, only $100 each. The Court of Appeals reversed the judgments because it considered $100 inadequate to compensate each plaintiff for the loss of First-Amendment rights. On remand, the trier of fact awarded sums of roughly $1,000 for each unlawful arrest, $400 for each "strip search" of a plaintiff, and various other sums for injuries that resulted from the unlawful action of the police. There was no further appeal.

The present case is different from *Dellums v. Powell* or *Tatum v. Morton* in important ways: the injuries suffered here are for the most part quite unlike the traditional, hands-on common-law torts like assault and false imprisonment that helped guide the courts in *Dellums* and *Tatum v. Morton.* Here no blows were struck. There was no physical restraint. None of these plaintiffs were so completely deterred from the exercise of their First-Amendment rights by defendants interference or harassment that the jury could have awarded sums that represented the total loss of the right to protest against the government; total loss of that right would, of course, have been "priceless," in any sense of the word. On the other hand, the jury was not required by the evidence to treat lightly the injuries suffered by plaintiffs simply because they were much smaller than they might have been. *Cf. Tatum v. Morton, supra,* 182 U.S.App.D.C. at 335, 562 F.2d at 1283. The defendants' actions were sustained over a much longer period of time than was involved in the confrontation-like situations considered in the earlier cases. Not one, but many efforts at association and expression were affected. The jury could have observed, and reacted, to the

evidence of the cumulative effect on each individual plaintiff of repeated, persistent, though subtle, harassment to impede political association and expression. The relatively limited nature of defendants' success in impeding plaintiffs' activities may have been considered by the jury to be more an indication of the special determination and discipline of the plaintiffs than of the skill, or absence of skill, of defendants in executing their plans.[42] Nevertheless, these awards would amount to far more than a year's compensation for the average person employed in the Washington area. Even making an allowance for the intangibility of the injuries the jury attempted to compensate and the high value our society places on freedom of expression, the awards border on the extravagant. *Cf. Tatum v. Morton, supra.* Each plaintiff may recover compensatory damages only for his or her own actual injuries. *Carey v. Piphus, supra; cf. Dellums v. Powell, supra,* 184 U.S. App.D.C. at 317–318, 566 F.2d at 209–10 (Leventhal, J., concurring).

In appraising these verdicts under the restraints imposed upon a trial judge the Court has also considered, to paraphrase *Dellums,* whether the liability of each individual defendant may be "totally out of proportion to any harm" that the individual defendant caused. *Cf. Dellums v. Powell, supra,* 184 U.S.App.D.C. at 304, 566 F.2d at 196. If the standards extrapolated from the District Court and Court of Appeals decisions in *Dellums* and *Tatum* were applied to the liability of the individual defendants here, the large verdict against each defendant might well be disproportionate to the harm caused by that defendant. These liabilities range up to about $75,000 in the case of defendant Brennan. The financial burden imposed by these verdicts upon government officials, and particularly retired ones, is heavy indeed. From their perspective it is difficult to say that the

**41.** *See Dellums v. Powell,* Civil Action No. 2271–71 (D.D.C., Dec. 13, 1979).

**42.** The Court is convinced that, in fixing the awards it did, the jury was not influenced by the kind of passion or prejudice that would require automatic invalidation of the verdicts. *Cf. Butts v. Curtis Publishing Co.,* 351 F.2d 702, 717 (5th Cir.1965), *aff'd,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

payments they are called on to make are commensurate with the harm the jury found that they caused personally. The actions which caused the injuries found by the jury occurred long ago and may be thought by some to be cured in substantial measure by time and by the very fact that the jury has heard the case and decided it for the plaintiffs against the defendants. Furthermore, plaintiffs suffered no financial loss against which defendants' financial burden can be compared. If in this case there were no restraints on the Court's prerogative and it could substitute its judgment for that of the jury, the Court would hold that the compensatory damage liability visited upon each defendant should be from ten (10) to twenty (20) percent of what the jury awarded. However, each defendant had some supervisory role, so that each shared responsibility for actions of other actors. More important, they were conspirators and shared responsibility for actions of a large number of co-conspirators. There is an inevitable inequity resulting from the fact that not all of the conspirators (possibly not even the principal conspirators) share proportionately in the financial burden of compensating these plaintiffs for injuries caused in part by co-conspirators. The law is such that a principal is responsible for his subordinate's actions in the circumstances here, and a co-conspirator is responsible for the actions of the conspiracy. This principle had to be applied in this case to make these defendants liable for injuries that other persons may have joined in causing without personal financial loss to themselves. *See generally 1 F. Harper & F. James, The Law of Torts* § 10.1 (1956); *W. Prosser, Handbook of the Law of Torts* 297 (4th ed. 1971); *see also id.* at 313–23.[43]

In view of the foregoing the Court has considered very carefully whether these considerations require, or permit a new trial or proposal of a remittitur of a substantial percentage of the compensatory damages. The jury was given instructions that followed, as closely as possible, the guidelines established by the Court of Appeals for compensation of First-Amendment injuries. Only by finding that the jury simply valued too high these plaintiffs' First-Amendment rights could the Court disturb the verdicts. Such a finding can be made only if it appears from all the evidence at trial that "the 'verdict is so unreasonably high as to result in a miscarriage of justice,' or . . . 'so inordinately large as obviously to exceed the maximum limit of a reasonable range within which a jury may operate.'" *Taylor v. Washington Terminal Co.,* 133 U.S.App. D.C. 110, 113–14, 409 F.2d 145, 148–49 (1969) (*quoting Frank v. Atlantic Greyhound Corp.,* 172 F.Supp. 190, 191 (D.D.C. 1969) *and Graling v. Reilly,* 214 F.Supp. 234, 235 (D.D.C.1963)). Though the question is a close one, in light of the burden on defendants, the Court cannot say that the compensatory awards to the eight prevailing plaintiffs can, under the *Taylor* standard, be set aside for excessiveness. Similarly the Court cannot say that the distinction in the verdicts between the five plaintiffs recovering one sum and the three recovering another sum impeaches the jury's work. Nor can the Court accept the District of Columbia's argument that the damages against itself were so extraordinary as to be excessive, even if the other awards were not.[44] So the Court concludes, with considerable reluctance, that whatever it might have ruled as a trier of fact, it is bound to leave undisturbed the jurors' decision on the measure of compensatory damages awarded in this constitutional tort and conspiracy case.[45]

The Court has considered, and rejected, the possibility that the jury erroneously awarded punitive damages against the District under the guise of compensatory damages.

---

**43.** Nothing decided here precludes any claim over for contribution against other co-conspirators or aiders or abettors or their estates.

**44.** The District may well have been held liable for injuries inflicted on plaintiffs by persons other than the individual MPD defendants named in this action. Such a result would not have been implausible under the *Monell* rule, or unreasonable given the evidence in this case.

**45.** There is simply no basis for assuming, as the FBI defendants have, that the verdicts are erroneous because they resulted in awards of the same amounts against defendants Jones and Pangburn. Whether the two were responsible

**B.** *Punitive Damages*

█ Punitive damages, assessed over and above the amount needed to compensate the injured party, are intended to punish the wrongdoer and to deter him and others from similar misconduct in the future. *See City of Newport v. Fact Concerts, Inc., supra,* 101 S.Ct. at 2759 (1981). In this case the jury awarded substantial sums in punitive damages against the five FBI defendants, former Chief Wilson, and former Inspector Herlihy. Each of those defendants now challenges the punitive awards.[46]

█ The standard for award of punitive damages is simple: "[t]he tort must be 'aggravated by evil motive, actual malice, deliberate violence or oppression.'" *Nader v. Allegheny Airlines,* 167 U.S.App.D.C. 350, 372, 512 F.2d 527, 549 (1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (*quoting Black v. Sheraton Corp. of America,* 47 F.R.D. 263, 271 (D.D.C.1969)). The evidence supported a finding by the jury that the FBI defendants—each of whom asserted a "good faith" immunity defense which the jury rejected— deliberately sought to oppress plaintiffs in the exercise of their First-Amendment rights. There was evidence that the FBI defendants acted with zeal, initiative, and resourcefulness in a campaign of deliberate disruption of lawful protest over a long period. They attempted and effected unlawful restraints on political association for the purpose of political expression. Their conduct violated clear commands of the Constitution as it has been repeatedly and authoritatively interpreted and enforced by the Supreme Court.[46A] "It is fundamental

that the trier of fact may find malice by drawing inferences from the defendant's conduct. These deductions are findings of fact and are subject to the clearly erroneous standard." *Nader v. Allegheny Airlines, supra,* 167 U.S.App.D.C. at 374, 512 F.2d at 551. With respect to the FBI defendants, the Court is convinced that there was ample evidence for an award of punitive damages.

█ The question then becomes, with respect to the five FBI defendants, whether the awards were excessive. *See Afro-American Publishing Co. v. Jaffe,* 125 U.S. App.D.C. 70, 83, 366 F.2d 649, 662 (1969) (en banc); *Central Armature Works v. American Motorists Ins. Co.,* 520 F.Supp. 283, 296 (D.D.C.1980). In a case of this type, in which plaintiffs have an independent statutory basis for recovery of attorneys' fees, punitive damages obviously have no role in compensating them for the costs of litigation. *Cf. Central Armature Works v. American Motorists Ins. Co., supra.* Nor is there a "profit" wrongfully obtained by the defendants in this case that should be disgorged through the punitive award. *Id.*[47] The sole functions of the punitive damages the jury awarded in this case were to punish and to deter. The Court cannot say that the awards the jury made, substantial as they were, were "larger than should be condoned in simple justice." *Afro-American Publishing Co. v. Jaffe, supra,* 125 U.S. App.D.C. at 84, 366 F.2d at 663. Confronted with the evidence in this case, the jury could well have decided, in the exercise of calm and dispassionate reason, that the sums it fixed as punitive damages against the FBI defendants were required as a sanction for those defendants' conduct and to ensure that such conduct would not be repeated in the future.

for the same *quantum* of plaintiffs' injuries is a question proper for the trier of fact, and the jury's result was scarcely so self-evidently irrational as to permit the Court to set the verdicts aside.

**46.** The parties did not brief the *City of Newport* case, and it was not until after the case had been submitted to the jury that the Court discovered the case. Consequently the Court erred in giving instructions that would have permitted a punitive award against the District of Columbia. *See* 101 S.Ct. at 2762. The error

was harmless, however, because the jury made no punitive award against the District government.

**46A.** *See, e.g., Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *NAACP v. Button,* 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963).

**47.** The fact that others responsible for damages caused by the conspiracy did not pay their share, cannot be weighed here.

The punitive awards against the two MPD defendants, however, stand on different footing. The jury has broad discretion in determining whether to award punitive damages, and in assessing the amount of punitive damages. *See City of Newport v. Fact Concerts, Inc., supra,* 101 S.Ct. at 2761. But despite the convincing proof of their participation in conspiracies among themselves and with the FBI defendants, the evidence will not support the punitive awards against the former MPD officers. Although there was evidence that the MPD defendants acted with a bad intent, there is no basis, in the evidence against them, for believing that a punitive award is required to deter similar conduct by MPD officers in the future. COINTELPRO was an FBI activity. The FBI defendants were among its instigators and its leaders. There is no evidence that the key FBI directives, with their call for initiatives to disrupt plaintiffs' associations, embraced the MPD defendants.[48] Deterrence of the FBI defendants could reasonably be expected to effect deterrence of all defendants and those who participated with them without imposition of separate punitive damages on MPD defendants. Though willing participants in the program to disrupt plaintiffs' activities, the MPD defendants followed the lead of the federal officers in many instances, and appear sometimes simply to have relied unreasonably on their own assumptions about the requirements of public order. However unreasonable a defendant's conduct may have been under the circumstances that confronted him, gross negligence will not justify a punitive award. *Chesapeake & Potomac Telephone Co. v. Clay,* 90 U.S.App.D.C. 206, 194 F.2d 888 (1952); *see also Nader v. Allegheny Airlines, supra.* And some evidence of bad intent—enough in this case amply to support the conspiracy verdicts—cannot alone support a punitive judgment unless such an award seems required to deter future misconduct. Whether it is called compensatory or punitive, the whole award granted to a plaintiff and against a defendant in a public action like the present one has a deterrent function. *See Owen v. City of Independence, supra,* 100 S.Ct. at 1416. Considering the evidence in a light most favorable to plaintiffs' claim for punitive damages, but also bearing in mind the jury's sizeable compensatory awards, the Court has concluded that the punitive judgment against defendants Wilson and Herlihy was not supported by the evidence. Wilson and Herlihy accordingly will have judgment n.o.v. on the punitive damages issue. *Cf. Afro-American Publishing Co. v. Jaffe, supra.*

## IX. Conclusion

An accompanying Order will grant the motions of defendants Wilson and Herlihy for judgments notwithstanding the verdicts assessing punitive damages against them, and deny all other motions. Plaintiffs' prayer for injunctive relief remains under advisement.

## ORDER

For the reasons stated in the accompanying Memorandum, it is this 31st day of May 1982 hereby

ORDERED: that the motion of the federal defendants for judgment notwithstanding the verdict or for a new trial be denied; and it is further

ORDERED: that the motion of the District of Columbia defendants for judgment notwithstanding the verdict assessing punitive damages against defendants Wilson and Herlihy be granted; and it is further

ORDERED: that the motion of the District of Columbia defendants for judgment notwithstanding the verdict or for a new trial, insofar as it seeks relief other than judgment notwithstanding the verdict assessing punitive damages, be denied.

---

**48.** *See* Plaintiffs' Exhibits 1–3.

APPENDIX I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JULIUS HOBSON, *et al.*,
 Plaintiffs, :

 v. : Civil Action No. 76–1326

JERRY WILSON, *et al.*,
 Defendants. :

**FILED**

SPECIAL VERDICT FORM

JUN 1 1982

JAMES F. DAVEY, Clerk

1. Did any of the following defendants injure plaintiff _____ in the exercise of that plaintiff's First Amendment rights or participate in one or more conspiracies that so injured plaintiff

| Name of Defendant | By claimed Individual Action | | By claimed F. B. I. Conspiracy | | By claimed M. P. D. Conspiracy | | By claimed Joint Conspiracy | |
|---|---|---|---|---|---|---|---|---|
| | Yes | No | Yes | No | Yes | No | Yes | No |
| Brennan | | | | | | | | |
| Moore | | | | | | | | |
| Jones | | | | | | | | |
| Grimaldi | | | | | | | | |
| Pangburn | | | | | | | | |
| Wilson | | | | | | | | |
| Herlihy | | | | | | | | |
| Acree | | | | | | | | |
| Bynum | | | | | | | | |
| Scrapper | | | | | | | | |
| Jagen | | | | | | | | |
| Suter | | | | | | | | |
| Mahaney | | | | | | | | |
| Kolego-Markovich | | | | | | | | |
| District of Col.* | | | | | | | | |

(FBI: Brennan, Moore, Jones, Grimaldi, Pangburn; D.C.: Wilson through District of Col.*)

If your answer is "no" to all of the foregoing questions, you should proceed no further; your "no" answers constitute a verdict for defendants. If your answer to any of these questions is "yes," proceed to the next page.

---

\* If you find the District of Columbia liable for the acts of employees, mark the space opposite the District of Columbia entry under "By alleged individual action."

2. Were any of the following defendants immune from responsibility as found in no. 1 above?

| Name of Defendant | Immune | Not Immune |
|---|---|---|
| **FBI** Brennen | | |
| Moore | | |
| Jones | | |
| Grimaldi | | |
| Pangburn | | |
| **D.C.** Wilson | | |
| Herlihy | | |
| Acree | | |
| Bynum | | |
| Scrapper | | |
| Jagen | | |
| Suter | | |
| Mahaney | | |
| Kolego-Markovich | | |

Your "immune" answers constitute a verdict for each defendant whom you have found to be immune. If you answered "immune" to all of the foregoing questions in no. 2, you should proceed no further, unless you found the District of Columbia liable in question no. 1. If you have answered any of the foregoing questions in no. 2 "not immune," or found the District of Columbia liable in question no. 1, proceed to the next page.

3. Was the liability of any defendant about whom you answered "yes" to question no. 1 and as to which you answered "not immune" to question no. 2 barred by the Statute of Limitations?

| Name of Defendant | Claims Barred | Claims Not Barred |
|---|---|---|
| **FBI** Brennen | | |
| Moore | | |
| Jones | | |
| Grimaldi | | |
| Pangburn | | |
| **D.C.** Wilson | | |
| Herlihy | | |
| Acree | | |
| Bynum | | |
| Scrapper | | |
| Jagen | | |
| Suter | | |
| Mahaney | | |
| Kolego-Markovich | | |

3a. If you found the District of Columbia liable in question no. 1, was that liability barred by the Statute of Limitations?

Claims barred [ ] Claims not barred [ ]

(mark one of the above boxes only if liability has been found in question no. 1).

Your answer of "claims barred" in the questions above constitutes a verdict on those claims for each defendant so identified. If you answered "claims not barred" with respect to any defendant, you should proceed to the next page.

4. If, with respect to claims against a defendant, you have answered "yes" to question no. 1, "not immune" to question no. 2, and "claims not barred" to question no. 3, you should enter opposite the name of that defendant as your verdict the amount of compensatory damages (if any) you find to be required fairly and reasonably to compensate plaintiff the amount of punitive damages (if any), and/or the amount of nominal damages (if any) to which you find plaintiff is entitled.

| Name of Defen-dant | Amount of Damages Compensatory * | Amount of Damages Nominal * | Amount of Damages Punitive | Total Damages |
|---|---|---|---|---|
| Brennen | | | | |
| Moore | | | | |
| Jones | | | | |
| Grimaldi | | | | |
| Pangburn | | | | |
| Wilson | | | | |
| Herlihy | | | | |
| Acree | | | | |
| Bynum | | | | |
| Scrapper | | | | |
| Jagen | | | | |
| Suter | | | | |
| Mahaney | | | | |
| Kolego-Markovich | | | | |
| Dist. of Col. | | | | |

FBI — Brennen, Moore, Jones, Grimaldi, Pangburn

D.C. — Wilson, Herlihy, Acree, Bynum, Scrapper, Jagen, Suter, Mahaney, Kolego-Markovich, Dist. of Col.

_____

FOREPERSON

_____

* Note: You cannot award both compensatory damages and nominal damages.

